**UNITED STATES of America, Plaintiff-Appellant,**

v.

**Stefano MAGADDINO et al., Defendants-Appellees.**

**No. 536, Docket 73-1933.**

United States Court of Appeals, Second Circuit.

Argued Jan. 9, 1974.

Decided May 2, 1974.

---

Alfred N. King, Special Atty., U. S. Dept. of Justice (John T. Elfvin, U. S. Atty., W.D.N.Y., Buffalo, N. Y., on the brief), for appellant.

Herald Price Fahringer, Buffalo, N. Y. (Lawrence A. Schulz; Lipsitz, Green, Fahringer, Roll, Schuller & James, Buffalo, N. Y., on the brief), for appellee Benjamin Nicoletti, Sr.

Joseph S. Conti, Niagara Falls, N. Y., for appellee Gino Frank Monaco; William B. Mahoney, Buffalo, N. Y., on the brief, for appellee Peter A. Magaddino.

Before DANAHER,* LUMBARD and TIMBERS, Circuit Judges.

LUMBARD, Circuit Judge:

On December 4, 1968, Stefano Magaddino, Peter Magaddino, Benjamin Nicoletti, Sr., Benjamin Nicoletti, Jr., Gino Monaco, Sam Puglese, Louis Tavano, Augustine Rizzo, Patsy Passero, and Michael Farella, since deceased, were indicted in the Western District of New York for use of facilities in interstate commerce to promote gambling and conspiracy to do the same in violation of 18 U.S.C. §§ 1952 and 371. Thereafter motions were made by the defendants to

* Senior Circuit Judge of the District of Columbia Circuit, sitting by designation.

suppress evidence which they alleged the government had illegally seized as well as for all other appropriate relief. Chief Judge Henderson took evidence regarding these motions at hearings which commenced June 28, 1971 and concluded on July 30, 1971. On May 17, 1973 he ordered the government to supply the defendants with the reports, files, and memoranda compiled from the tapes and logs of illegal electronic surveillance conducted at three locations by the F.B.I. from 1961 to 1965. The court also ordered the disclosure of the identity of a confidential informant identified as the independent source named in affidavits used to secure twenty-two warrants in November 1968 authorizing searches of the homes of all the defendants, premises owned by several of their associates, and a number of automobiles. The court ordered these disclosures because

> In the absence of some information concerning the confidential informant and the documents prepared from the illegal electronic surveillance, a conclusion by this court that the evidence presented in support of the original search warrants and subsequent indictment was obtained through sources untainted by the six years of illegal governmental activity, would not only be unsupported by the evidence of the record, it would be pure speculation.

The government was given twenty days to comply with the order or suffer dismissal of the indictment. On June 12, 1973, after this time limit had expired, the United States Attorney filed an affidavit declining to disclose the materials enumerated in the court order. The district court then dismissed the indictment the same day, and the government took this appeal. We affirm as to all defendants except Passero and Rizzo, with regard to whom we reverse.

The undisputed evidence adduced at the suppression hearing established that beginning in April 1961, the F.B.I. placed bugs at several locations in the Buffalo area, including the Magaddino Memorial Chapel in Niagara Falls, the Capitol Coffee Shop,[1] also located in Niagara Falls, and the Camelia Linen Supply Company in Buffalo. According to the government, the purpose of this electronic surveillance was to gather intelligence on a feud between the Magaddino and Bonanno familes over control of certain illegal activities in Canada and the Western United States. The surveillance, which the government conceded to be illegal, continued until sometime in 1965. In the course of monitoring the bugs the F.B.I. agents overheard conversations engaged in by the Magaddinos and Benjamin Nicoletti, Sr.

As the conversations were monitored, they were tape-recorded. Logs were kept and reviewed on a daily basis by "coordinating" agents, who then prepared "channelizing" memoranda. The channelizing memoranda classified the information obtained and included the names of those persons whose conversations had been overheard and the names of individuals mentioned in the course of these conversations. Copies of the memoranda were then placed in the individual case files of each of the individuals named.

On the basis of the channelizing memoranda as well as other information contained in an individual's file, the agent assigned to that individual would from time to time prepare an investigative report, which would eventually be relied upon by the United States Attorney in deciding whether to prosecute that individual.

In addition to the channelizing memorandum and the investigative report, a "justification" report was prepared every three months for the purpose of justifying continued electronic surveillance. The report contained summaries of the intelligence gathered by the electronic surveillance since the previous justification report. Copies of the report were placed in the files of the individuals named.

1. The electronic surveillance at this location was continued for only a few weeks.

Several other files were also maintained. A "dissemination of information" file contained copies of memoranda which had been sent to Washington, to other bureau offices and to state and local police. This information included intelligence derived from electronic surveillance. An organized crime control file was also maintained. It included copies of all the data placed in the files of those individuals suspected of having ties with organized crime. Information coming from local and state authorities was not kept in a separate file; this material went directly into the files of those individuals to whom it pertained. Finally, on the basis of information obtained from electronic surveillance, it was from time to time concluded that informants should be sought out. The recommendation for obtaining informants was also placed in the relevant individual case files.

Agents concentrating on organized crime had ready access to all individual case and control files. The intelligence obtained from the illegal electronic surveillance was not segregated from information legally obtained. The material obtained from the illegal surveillance was constantly supplemented and updated by new information, both legally and illegally obtained. Periodically, conferences were held to discuss the progress of various investigations. All agents assigned to organized crime were required to read and initial investigative reports prepared by other agents similarly assigned. In these reports as well as all other materials circulated, both an electronic and informant source of information were identified by the same symbol, so that, aside from the agent dealing directly with the source, no other person could determine whether the information had been obtained by electronic surveillance or an informant. A similar procedure was followed when information obtained from one bureau office was sent to other bureau offices around the country. This information was also placed in individual case files.

In November 1964, Special Agent Joseph Griffin, who was to prepare the principal affidavit in support of the search warrants authorized in 1968, was assigned to the Buffalo bureau of the F.B.I. His special interest was organized crime's gambling activities, but as an initial task he was assigned, due to his fluency in the Italian language and the Sicilian dialect, the task of translating those portions of the illegally taped conversations which were not in English. He was also required to listen to English portions of the tapes, however, so that he would understand the context in which the foreign language comments were being made.

Griffin admitted that, in the course of translating the tapes, he first heard the name of Benjamin Nicoletti, Sr., and learned of his ties with the Magaddinos. At the same time Griffin was also in charge of somewhere between 40 and 70 individual files relating to gambling. He did not deny that he may have heard the names of the defendants as well as others mentioned on the tapes which he translated. He also admitted the possibility that he had reviewed the files of the Magaddinos and Nicolettis. Griffin, who had never worked in Buffalo before, was able to develop an informant within one month of his arrival. He met with this informant once a month, but at no time did he question him about the source of his information and whether the source was legal or illegal.

After the electronic surveillance ended in 1965, Griffin concentrated for the next three years on gambling activities in the Buffalo area. He was in continuous contact during this period with Henry Splendor and Raymond Kruger, F.B.I. special agents assigned to the Niagara Falls bureau, who also concentrated on organized crimes's gambling activities. There was a free exchange of information between Griffin and these agents, many times without any indication as to the source of the information exchanged.

In 1965 grand jury subpoenas were issued to the Magaddinos on Griffin's rec-

ommendation. He subsequently participated in two raids involving Benjamin Nicoletti, Jr., in 1967 and 1968, the first at which he was the officer who specifically identified Nicoletti. Griffin also took a special interest in the Magaddino-Bonanno feud, and because of this received logs and records associated with the 1961–1965 electronic surveillance. Additionally, the 40 to 70 individuals assigned to him were in most instances directly engaged in gambling activities in the Buffalo area. Although this should have given him a fairly clear picture regarding the leading gambling personalities in the Buffalo-Niagara Falls area, he testified at the suppression hearing that not until June 1968 when he obtained information from his informant, did he have any knowledge of Puglese, Passaro, Monaco, Tavano, and Farella.

Griffin also testified that although he was in frequent contact with Special Agent Kruger in Niagara Falls and that they exchanged information regarding organized gambling activities, he at no time obtained information about these defendants from Kruger, even though as early as February 1968 Kruger was receiving detailed information on the structure of the Magaddino-Nicoletti operation, including admissions by Monaco and Puglese that they were bookmakers.

In November 1968, Griffin submitted an affidavit in support of the 22 search warrants directed at the defendants, in which he outlined the structure of the Magaddino gambling empire, which he claimed at the suppression hearing he had learned solely from his informant. In his affidavit, Griffin characterized Passero, Monaco, Tavano, Puglese, Rizzo, and Farella as bookmakers in the employ of Benjamin Nicoletti, Jr., who supervised bookmaking activities for his father, who in turn accounted to the Magaddinos.

During the period of Griffin's investigation of gambling activities in the Buffalo area, the state and local police were also conducting their own investigations. In particular, in May and June 1967,

John Belkota, a lieutenant on the Niagara Falls police force supervised the monitoring of two taps on phones used by Puglese and Monaco. Although Belkota testified that these taps had been court-authorized, no record of a warrant could be found. As a result of this and other evidence, the district court concluded that these taps had been illegal.

Belkota who had obtained substantial evidence relevant to several of the defendants from these taps, relayed his material on an almost daily basis to Special Agent Kruger. The information obtained from Belkota, was, according to Kruger, of great assistance to his own investigation. The state police also provided Kruger and Griffin with intelligence on organized crime's gambling activities in the Buffalo area. The source of this information was rarely disclosed. The state police also passed materials to Belkota who often transmitted it on to Kruger. Kruger admitted that he then exchanged his information with Griffin. Affidavits of Kruger and Belkota were filed in support of Griffin's application for search warrants in 1968.

### I.

In Alderman v. United States, 394 U. S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), the Supreme Court, reiterating the long-standing rule that evidence obtained by illegal means and the fruits of such evidence must be suppressed, Silverthorne Lumber Co. v. United States, 251 U.S. 385, 391–392, 40 S.Ct. 182, 64 L.Ed. 319 (1920), Silverman v. United States, 365 U.S. 505, 81 S.Ct. 679, 5 L. Ed.2d 734 (1961), recognized the need for a full adversary hearing to determine whether evidence had, in fact, been illegally seized or substantially tainted by a prior illegal seizure. In doing so, the Court endorsed an allocation of the burdens of proof between the parties first announced in Nardone v. United States, 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939).

Under this allocation of the burdens of proof, the "burden is, of course, on the accused in the first instance to prove

to the trial court's satisfaction that wire-tapping was unlawfully employed." *Id.* Once this is established, the "trial judge must give opportunity, however closely confined, to the accused to prove that a substantial portion of the case against him was the fruit of the poisonous tree." *Id.* Finally, if the defendant has come forward with this evidence, the government must "convince the trial court that its proof had an independent origin." *Id.* The government has the ultimate burden of persuasion. Alderman v. United States, 394 U.S. at 174.

■ The defendants here may be classified in three groups, the first group consisting of the Magaddinos and Benjamin Nicoletti, Sr., the second group comprised of Nicoletti, Jr., Monaco, Puglese, and Tavano, and the third group made up of Rizzo and Passero. It is clear that the Magaddinos and Nicoletti, Sr., have satisfied the requirement of establishing that electronic surveillance was unlawfully employed against them. Indeed, the government concedes that their conversations were overheard through the use of illegal electronic surveillance from 1961 to 1965 by the F.B.I.

Less certain is whether the second group of defendants have satisfied this standard. No showing has been made that their conversations were intercepted by the federal government. Nevertheless the district court did conclude that their phones or conversations had been illegally tapped by the Niagara Falls police. Since the evidence at the hearings showed beyond a doubt that virtually all the information gathered from these taps was passed on to the F.B.I. and that the two law enforcement bodies were working in close cooperation, it must be concluded that Nicoletti, Jr., Monaco, Puglese, and Tavano have discharged their burden of showing that they were the victims of illegal wiretapping. *See* Benanti v. United States, 355 U.S. 96, 78 S.Ct. 155, 2 L.Ed.2d 126 (1957). In *Benanti*, the Supreme Court expressly held that evidence obtained by illegal wiretapping "whether by state or federal agents, is inadmissible in federal court." Id. at 100.

The third group of defendants, Passero and Rizzo, poses a different problem since it has not been shown that the phones of Passero and Rizzo were tapped or their conversations intercepted. "Fourth Amendment rights are personal rights, which . . . may not be vicariously asserted." Alderman v. United States, 394 U.S. at 173. These two defendants, having failed to satisfy the burden of proof which rested on them to show an illegal invasion of their particular fourth amendment rights, lack standing to question the legality of the warrants at issue here. United States v. Sacco, 436 F.2d 780, 784 (2d Cir.), cert. denied, 404 U.S. 834, 92 S.Ct. 116, 30 L.Ed.2d 64 (1971); United States v. Masterton, 383 F.2d 610, 614 (2d Cir. 1967), cert. denied, 390 U.S. 954, 88 S.Ct. 1048, 19 L.Ed.2d 1147 (1968); cf. Brown v. United States, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973). Consequently, we reverse the district court's order with regard to Passero and Rizzo.

The next question is whether there has been a substantial showing that the evidence recited in the affidavits filed in support of the warrants was tainted. Here there can be little doubt that the Magaddinos and Nicoletti, Sr., have demonstrated this. Indeed, Agent Griffin conceded at the suppression hearing that he first learned of Benjamin Nicoletti, Sr., from listening to and translating the tapes of the illegal electronic surveillance. These same tapes revealed to him the gambling link between Nicoletti, Sr., and the Magaddinos.

Nicoletti, Jr., Monaco, Puglese, and Tavano have also satisfied their burden to come forward with substantial evidence of taint. Special Agent Kruger admitted at the hearing that Belkota had relayed to him considerable information he had not previously had relating to conversations of these defendants which Belkota had overheard.

Moreover, the F.B.I. bureau in Buffalo and the one in Niagara Falls can hardly be regarded as independent entities. Not only did these offices and their agents, Griffin and Kruger, work

in close cooperation, but there was a constant flow of information between the two offices. A clear showing by these defendants that one of the agents carrying on a joint investigation relied on illegally obtained evidence is more than adequate to satisfy the second stage requirement of *Alderman*.[2]

■ Although these seven defendants satisfied their burden under *Alderman*, the government has failed to come forward with sufficient evidence to establish an independent source for the information contained in the affidavits supporting the search warrants. *See* United States v. Cole, 463 F.2d 163, 172 (2d Cir.), cert. denied, 409 U.S. 942, 93 S.Ct. 238, 34 L.Ed.2d 193 (1972). Against a background of pervasive obtaining of information by illegal means, the government has made only unsubstantial claims that the informant was the source of the information set forth in the affidavits and that he had been identified and developed independent of the illegal electronic surveillance. This was insufficient to satisfy the government's burden of persuasion. United States v. Huss, 482 F.2d 38, 50 (2d Cir. 1973); United States v. Tane, 329 F.2d 848 (2d Cir. 1964).

Under the circumstances, the district court was well within its discretion in requiring the government to disclose the identity of the informant as well as reports, memoranda, and files related to the surveillance of 1961–1965. Alderman v. United States, 394 U.S. at 184. The failure of the government to produce its informant is fatal to its claim that the evidence should not be suppressed.

## II.

The government argues, however, that even if the district court's decision was proper, the government should now be permitted to reopen the hearing and offer testimony that the name of the informant was not developed as a result of illegal surveillance and that the surveil-lance in no way was used to obtain his cooperation.

■ But Chief Judge Henderson did allow the government that choice and the government chose to do nothing. Here the court permitted the government twenty days to reconsider its strategy. That was sufficient time, especially since within that period the government made no application for additional time to decide upon its course. Moreover, while we agree that the government under certain circumstances should be permitted an opportunity after the suppression hearing to reconsider its position on disclosure and to present further evidence to persuade the court of the existence of an untainted independent source without actually disclosing that source's identity, this is a matter largely within the discretion of the district judge. United States v. Tucker, 380 F.2d 206 (2d Cir. 1967).

■ The government's claim that the district court has authorized the defendants to go "rummaging" through its files is equally without merit. The order carefully limits the documents to be disclosed to those relevant to the surveillance which was illegally conducted. The degree of disclosure was a matter within the discretion of the district judge, and we find no reason to believe that Chief Judge Henderson's ruling was an abuse of discretion, Alderman v. United States, 394 U.S. at 185. Indeed, his suppression of the evidence seems quite reasonable in light of the substantial evidence of taint presented at the suppression hearing. See United States v. Schipani, 289 F.Supp. 43 (E.D.N.Y. 1968), aff'd, 414 F.2d 1262 (2d Cir. 1969).

■ For these reasons, we must affirm the action of the district court in suppressing the evidence resulting from the 1968 search warrants as to all defendants, except Rizzo and Passero. The suppression of such evidence ordinarily would not result in the dismissal

---

2. We need not decide whether the defendants' showing of a failure by the F.B.I. to purge illegally obtained information from those files to which all agents, including Griffin, had access, and its failure to keep a record of who actually used these files, satisfies the defendants' burden of coming forward.

of the indictment as to these defendants. However, all the parties have treated the indictment of each defendant as resting entirely on the legality of the search warrants issued and executed in November, 1968. The government has nowhere contended to the contrary. Consequently we affirm the order dismissing the indictment, *see* United States v. Tane, 329 F.2d 848, 853–854,[3] except as to Rizzo and Passero. We reverse the order dismissing the indictment against Rizzo and Passero and remand for further proceedings.

---

3. Ordinarily the proper sanction for the government's failure to come forward is suppression of the evidence and not dismissal of the indictment. Costello v. United States, 350 U.S. 359, 76 S.Ct. 706, 100 L.Ed. 397 (1956); United States v. Kahn, 366 F.2d 259, 264 (2d Cir.), cert. denied, 385 U.S. 948, 87 S.Ct. 321, 17 L.Ed.2d 226 (1966).