UNITED STATES of America, Plaintiff,

v.

Vito GIACALONE, Richard Stanley Zalmanowski, Elias Louis Koury, David Feldman and Kenneth Charles Baker, Defendants.

Crim. No. 77–80449.

United States District Court,
E. D. Michigan, S. D.

Aug. 19, 1977.

Philip Van Dam, James K. Robinson, C. Stanley Hunterton, Detroit, Mich., for plaintiff.

N. C. Deday LaRene, Detroit, Mich., Richard M. Lustig, Southfield, Mich., George E. Woods, Detroit, Mich., Sanford Rosenthal, Southfield, Mich., James C. Thomas, Royal Oak, Mich., for defendants.

## OPINION AND ORDER DENYING DEFENDANTS' MOTION TO SUPPRESS PRODUCT OF ELECTRONIC DEVICE IN DEFENDANT ZALMANOWSKI'S AUTOMOBILE

CORNELIA G. KENNEDY, District Judge.

All of the defendants have moved to suppress conversations overheard as the result of an electronic interception device which was placed in defendant Zalmanowski's automobile. The device was planted and the conversation intercepted on the basis of the authority granted the Federal Bureau of Investigation, by an order of The Honorable Philip Pratt, a judge of this court. The order was issued on the basis of affidavits presented to him that indicated that there was probable cause to believe the the automobile was being used to conduct the gambling business under investigation in that it was used as a place to carry on conversations necessary to such a business. No attack on the sufficiency of the affidavits to establish probable cause has been made. Nor do the defendants claim any procedural or statutory irregularities in the manner in which the court order for interception was obtained.

Their motion to suppress attacks the interception on three grounds, the first of which is that the order is overly broad. This claim is based upon the fact that the order does not specify the time, place or manner of entry for purposes of installing or removing the bug. It merely states:

> It is further ordered that special agents of the Federal Bureau of Investigation are authorized to surreptitiously enter the foregoing vehicle for the purpose of installing, maintaining, and removing any such oral interception devices utilized pursuant to the authority granted by this order.

The second claim is that Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510, *et seq.*, does not authorize law enforcement officers to use illegal means to implant an electronic surveillance device, or, if it does so provide, violates the Fourth Amendment and is unconstitutional. A final argument is that the proceeds of the bug should be suppressed for the reason that the surveillance was not conducted in a manner intended to minimize the extent of the intrusion.

The question of whether the order which authorized the installation of the bug was overbroad is one of first impression in this Circuit, although it has been confronted by at least one other Circuit. In *United States v. Ford*, 180 U.S.App.D.C. 1, 553 F.2d 146 (1977), a situation similar to the one before this Court was considered. An authoriza-

tion order in that case allowed police officers

> to *enter* and *re-enter* [a business establishment] for the purpose of installing, maintaining and removing . . . electronic eavesdropping devices. *Entry and re-entry may be accomplished in any manner, including, but not limited to, breaking and entering or other surreptitious entry, or entry and re-entry by ruse and stratagem. Id.* at 149–50 (emphasis in original).

After an exhaustive discussion of the evolution of Fourth Amendment law, the District of Columbia Circuit concluded that "the failure of the order to limit time, manner, or number of entries over a 40-day period made the authorization far too sweeping," *id.* at 170, and ordered that the evidence derived from the bugs be suppressed. In coming to this conclusion, the court limited its holding by stating:

> [W]e hold only that the warrant in this case was defective for expressly authorizing any number and manner of entries when there had been no showing of necessity for such broad authorization. *Id.*

In short, it was their conclusion that the demands of the situation did not justify the broad authorization.

■ To determine the amount of deference that should be accorded the D. C. Circuit's opinion in *United States v. Ford*, it is necessary to first note the similarities and differences between the two cases. It is apparent at once that the most outstand-

ing similarity between the two cases is the similar breadth of the authorization order involved in each case, but there are also important differences.[1] Perhaps the most significant difference is the object of the intrusion in each case: *Ford* involved a business establishment, while this case involves an automobile. Although this Court is well aware of the fact that "[t]he word 'automobile' is not a talisman in whose presence the Fourth Amendment fades away and disappears," *Coolidge v. New Hampshire*, 403 U.S. 443, 461–62, 91 S.Ct. 2022, 2035, 29 L.Ed.2d 564 (1971), it also realizes that the fact that an automobile is the target of an intrusion requires a consideration of factors not involved when the target is a stationary object. It is also true that an automobile has a lesser privacy interest than a business establishment, and whatever privacy an automobile may afford will be obliterated by the advent of a single bug.

The death knell for the evidence derived from the authorization order in *Ford* was the order's failure to limit time, manner, and number of entries over an extended period of time; in the case of an automobile, it would be impractical to include the first two of those limitations. An automobile may be moved at any time, and its location is likely to be the critical factor in determining when and how to enter the vehicle. The mere fact that a car is involved, therefore, would make it unreasonable to require a judge or magistrate to specify the time or manner of entry in an authorization order.[2] The result would be

---

1. One difference not discussed in the text relates to the language of the two authorization orders. The order involved in *Ford* authorized the executing officers "to enter *and re-enter* . . . for the purpose of installing, maintaining and removing . . . electronic eavesdropping devices," 180 U.S.App.D.C. at 4, 553 F.2d at 149, while the order involved in this case allowed the FBI agents only "to . . . enter" for those purposes. The differences could be read to mean that the police officers in *Ford* could enter to install one device and then re-enter to install a number of additional devices while the FBI agents involved in the case before this court would only be permitted to enter once to install their devices. The difference between a building and a car is important in this context, for while one properly function-

ing device would pick up a conversation taking place anywhere within the automobile, it might turn out that the device(s) placed in a building during the first intrusion are not in the right location; several *re-entries* for the purpose of installing additional devices might be necessary to achieve optimal placement.

2. To require the order for entry to specify the exact time and place would be similar to requiring an arrest warrant to include such directions. There are too many variables that may be encountered to make such direction practicable. For the same reason, except for a requirement (by court rule) that a search warrant be served between 6 a. m. and 10 p. m. unless otherwise specified (there is also a knock and notice requirement, but announce-

more likely to result in a scene out of a keystone kops comedy, with officers scurrying to secure a warrant only to find that the automobile has been moved and having then to go through endless iterations of the same activities until they are finally fortunate enough to be able to execute the order, than it is to further the interest of society in safeguarding both Fourth Amendment rights and the safety of the public and law enforcement officers. This leaves the question of whether the issuing judge's failure to limit the number of entries into the automobile other than by specifying that entries could be made only if necessary for the purpose of installing, maintaining or removing the interception devices utilized necessitates a finding that the order was overbroad.

■ To determine whether a failure to limit an authorization order in such a manner as to allow no more than one entry per order should be considered fatal to the order's validity, a court must approach the problem with the realization "that the Fourth Amendment's commands . . . are practical and not abstract." *United States v. Ventresca*, 380 U.S. 102, 108, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965). An authorization order, no less than an affidavit for a search warrant, must be viewed in a commonsense and realistic fashion. *Id.* A commonsense approach requires a court to consider: (1) what the order in reality authorizes; (2) to what extent a more narrowly defined order would better protect the Fourth Amendment interests involved; and (3) whether a reasonableness requirement which allowed the victim of an intrusion to challenge its reasonableness after the fact would not as effectively safeguard the Fourth Amendment interests involved. An evaluation of these three factors will enable this Court to determine whether the specific situation which confronted the issuing judge provided the "necessity for such broad authorization," *Ford*, 180 U.S.App. D.C. at 25, 553 F.2d at 170, as was here granted.

■ When the language of the order is closely examined, it at once becomes clear that the authority granted was ,not very broad. The FBI was authorized to enter the vehicle surreptitiously, but only for three specific purposes—installing, maintaining, and removing the bug. Assuming that it is permissible to authorize law enforcement officers to enter a constitutionally protected area for the purposes of installing electronic surveillance devices, see discussion, *infra*, it is clear that the authorization order could authorize the initial intrusion for the purpose of installing the bug. The question then becomes whether it would have been reasonable to have required that the FBI secure an additional authorization for entry any time, the bug malfunctioned and/or to remove the bug at the end of the surveillance. If this question is answered in the affirmative, it will then become necessary to determine whether such a requirement would advance any Fourth Amendment interest.

In the case of an additional entry made for the purpose of maintaining the previously installed device, it appears to this Court that a requirement that the FBI seek an additional entry authorization would not be reasonable. First, as the affidavit in support of the application for the authorization order makes clear, Mr. Zalmanowski's car was known to be the location of a continuing series of discussions regarding the operation of the gambling conspiracy under investigation. It was critical to the success of the investigation and to its rapid conclusion that the FBI be able to monitor these conversations, and a long delay in the repair of a malfunctioning device could seriously impede or delay the investigation. A long delay could occur if the agents were to miss an opportunity to repair the bug due to a need to require an additional entry authorization only to have the automobile then become inaccessible due to location and/or use for a significant period of time.

A second consideration is that the terms of the authorization order imposed signifi-

ment may be excused under certain circumstances) search warrants do not direct the

manner of entry, nor except for the 10-day limit, the time of execution.

cant restraints upon the FBI. It required the FBI to terminate the interception when communications are intercepted which reveal the manner in which [the alleged co-conspirators] conduct, finance, manage, supervise, direct or own all or part of an illegal gambling business . . . or [upon the expiration] of twenty (20) days from the date of the Order, whichever is earlier. Order A–5–24–76–PP at 5.

It further required that progress reports be provided to the court on the 5th, 10th and 15th days following issuance of the order, id., at 6. If the contents of the reports were to indicate that the surveillance should be discontinued at any time, the court could sua sponte order that the bug be removed and surveillance cease.

A final consideration is that the very nature of the activity involved inherently guaranteed that entry would be made only when absolutely necessary and even then in the most discreet and unobtrusive manner possible. It is apparent that each entry would present the possibility of detection. Detection would, at the very least, threaten the success of the investigation and could quite possibly result in violence. The risk involved in any surreptitious entry, both in terms of its threat to the success of the venture and the life of the agent involved, would, therefore, be a strong deterrent to any unnecessary entries, and the effectiveness of this safeguard was, this Court is certain, obvious to the court that issued the order. This Court, therefore, concludes that a requirement that the FBI seek an additional entry authorization any time that it might become necessary to repair the bug would not be reasonable.

■ Assuming for the sake of argument that this Court were to have found that a re-authorization requirement was reasonable, it would still have to determine whether such a requirement would advance any interest protected by the Fourth Amendment. The same considerations which caused this Court to conclude that it would be unreasonable to require a new authorization for each entry needed to maintain the bug militate strongly in favor of a finding

that such a requirement would serve no such purpose. The terms of the order dealing with termination of surveillance, what could be intercepted, and reporting of results are designed to keep the court abreast of the bug's efficacy and limit the extent and scope of the intrusion, thereby according that court the opportunity to terminate the surveillance at any time that it believed further intrusion to have become unwarranted. Just as the risks involved in any surreptitious entry make it inconceivable to this Court that any unnecessary entry would be undertaken by the FBI, it is equally inconceivable that any court that had authorized an initial entry and not concluded that surveillance should be terminated would fail to authorize an entry needed to repair the bug had it malfunctioned. It is this Court's opinion that any such requirement would further no interest protected by the Fourth Amendment; its only effect, and an obvious one at that, would be to seriously impede effective and efficient law enforcement.

■ A final consideration is that even if it were to be assumed that a Fourth Amendment interest would be protected by the requirement of an additional authorization order for the purpose of a re-entry required to maintain a bug, any such interest could be adequately protected by a reasonableness requirement reviewable by a court upon the filing of a motion to suppress. Should it be claimed at that time that a law enforcement officer used the re-entry authorization in an unreasonable manner, the court could then order the proceeds of the surveillance suppressed. In this case, there is no serious claim that the authority granted by the court's authorization order was abused. Had it been abused, this Court would not hesitate to order the proceeds suppressed on the grounds that Mr. Zalmanowski's privacy interests had been unreasonably invaded. In this case they were not unreasonably invaded by any activity occurring as a result of the inclusion in the order of authorization for the FBI to re-enter to maintain the bug.

The issue of whether authorization to enter to remove the bug made the order overbroad is less complex than the issue regarding the authority granted to re-enter for the purpose of maintaining the bug. Indeed, this issue is analogous to the initial intrusion for installation issue.

It is important to note that the Court at all times had effective control over when the bug would be removed. For all intents and purposes, the order was directing the FBI to remove the bug on or shortly prior to the expiration of the twentieth day from the entry of the order unless the court ordered it removed sooner on the basis of the reports which were to be filed in the interim or unless the authorization were to be extended. Since it is clear that the surveillance device had to be installed initially and that to effectively safeguard the privacy interests of those individuals whose conversations might otherwise continue to be overheard it had to be removed upon or prior to the expiration of the authorization order or any extension thereof, it is clear that the inclusion of an authorization in the order that the vehicle could be entered to remove the device did not make the authorization order overbroad. The inclusion of the authorization could only work to the advantage of any potential occupant of the car, including Mr. Zalmanowski; its presence was only capable of resulting in an earlier termination of the surveillance.

On the basis of the foregoing analysis, this Court concludes that the authorization order which is the subject of this motion to suppress was not overly broad. The authority which it granted to agents of the FBI was only that which was reasonably necessary to enable the FBI to conduct in an effective and efficient manner electronic surveillance of conversations in the automobile of Mr. Zalmanowski. An important consideration in this Court's holding is the fact that the object in which the bug was to be placed was an automobile. The automobile's mobility and the ease with which one can determine whether it is occupied are two important considerations in this Court's conclusion that the authorization order's failure to specify the time, manner and number of entries did not make it overly broad; this Court expresses no opinion as to whether it would reach the same conclusion if the place in which the bug was to be planted were a house or other building.

The Court will next address the question of whether the Omnibus Act authorizes law enforcement officers to use surreptitious means to implant an electronic surveillance device and, if it does, whether it thereby violates the Fourth Amendment and is unconstitutional. In *United States v. Ford, supra,* the District of Columbia Circuit did not address this issue, instead assuming for the sake of its analysis of the overbreadth issue that surreptitious entries would be constitutional in some circumstances. 180 U.S.App.D.C. at 25, 553 F.2d at 170. Having concluded that the authorization order was overbroad, it did not need to reach the issue which presently confronts this Court, but the Eighth Circuit has faced the issue and concluded that neither the Constitution nor the Omnibus Act prohibits surreptitious entry. *United States v. Agrusa,* 541 F.2d 690, 696–701 (8th Cir. 1976), *cert. denied,* 429 U.S. 1045, 97 S.Ct. 751, 50 L.Ed.2d 759 (1977).

Title III of the Omnibus Act is silent on the question of whether surreptitious entry can be utilized as a means of installing an electronic surveillance device. Its purposes can be argued in support of the positions of both the defendants and the government, with the defendants' best argument being that a primary purpose of the Act was "[to protect] the privacy of wire and oral communications . . .." S.Rep.No.1097, 90th Cong., 2d Sess. 66 (1968), U.S.Code Cong. & Admin.News, 90th Cong., 2d Sess., pp. 2112, 2153 (1968). However, "Title III was drafted to meet [the standards of *Berger v. New York,* 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967)] and to conform with *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)," *id.,* and *Berger* provides implicit, but nonetheless strong, support for the proposition that neither Title III nor the Fourth Amendment proscribes surreptitious entry for the purpose of installing electronic surveillance devices.

The *Berger* Court was confronted with the question of whether evidence derived from electronic surveillance devices which had been planted in two offices could be used in a criminal trial which was the result of the surveillance. The bugs had been planted in conformity with an eavesdrop order issued by a Justice of the State Supreme Court in conformity with New York's eavesdrop statute. The statute empowered a state supreme court justice, a county judge, or a general sessions judge of New York County to issue an *ex parte* eavesdropping order upon oath or affirmation of a district attorney, the attorney general, or a police officer above the rank of sergeant that (1) states there is reasonable ground to believe that it would produce evidence of a crime, (2) particularly describes the person(s) to be overheard, (3) states the purpose of the surveillance, and (4) identifies the particular telephone number or telegraph line to be tapped. 388 U.S. at 54, 87 S.Ct. 1873. The order could authorize the surveillance to continue for up to 60 days and could be further extended. *Id.* The statute also permitted "unconsented entry without any showing of exigent circumstances." *Id.* at 60, 87 S.Ct. at 1884. The Court had little trouble deciding that the statute as drawn was unconstitutional, concluding that its language was so broad that it permitted "a trespassory invasion of the home or office, by *general warrant*, contrary to the command of the Fourth Amendment." *Id.* at 64, 87 S.Ct. at 1886 (emphasis added).

During the course of its analysis of the statute, however, the Court made several observations as to the precise reasons why the statute failed to pass constitutional muster, made specific suggestions as to how these defects could be cured, and strongly implied that a constitutional statute could be drafted. *Id.* at 55–60, 87 S.Ct. 1873. The Court specifically pointed out that the statute failed to comply with the Fourth Amendment's requirement that it particularly described the " 'place to be searched,' or 'the persons or things to be seized.' " *Id.* at 55, 87 S.Ct. at 1882. It also failed (1) to require a specification of the specific crime

that had been or was being committed, *id.*, at 56, 87 S.Ct. 1873, (2) to require a description of the particular type of conversation sought, *id.* at 57, 87 S.Ct. 1873, and (3) to limit the extent of the intrusion by providing that once the conversations sought had been seized, the surveillance must be terminated, *id.* at 59–60, 87 S.Ct. 1873. Finally, the Court noted that the statute had no notice requirement. *Id.* at 60, 87 S.Ct. 1873. Significantly, it did not condemn the fact that the statute permitted an officer to utilize an unconsented entry to effectuate the surveillance; this facet of the statute was criticized only because the unconsented entries were authorized without requiring either notice or a showing of exigent circumstances. *Id.*

 In light of the fact that Title III was drafted to comply with the Supreme Court's decisions in *Berger*, and *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), and the fact that *Berger* did not condemn the unconsented entry aspect of the New York eavesdropping statute, it is the opinion of this Court that Congress did not intend to restrict the use of unconsented entries employed to install electronic surveillance devices in any way not mandated by the Fourth Amendment. *See United States v. Agrusa*, 541 F.2d 690, 698–700 (8th Cir. 1976). Therefore, if the unannounced breaking and entering of the automobile were constitutionally permissible, the Court's conclusion would necessarily be that the basis for suppression here being considered, *i. e.,* that if Title III does not proscribe unconsented and unannounced entries it is unconstitutional, is unmeritorious.

Any examination of the law of unannounced breaking and entering to conduct a search or effect an arrest must begin with *Ker v. California*, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963). That case involved an unannounced entry employed by police officers to make an arrest and prevent the destruction of evidence. The police entered the defendants' apartment by use of a passkey, but for purposes of its analysis, the Court assumed that this constituted a breaking. *Id.* at 38, 83 S.Ct. 1623.

To justify their unannounced entry, the police officers relied on an exigent circumstances exception to the state's knock and announce statute. It was their position that had they complied with the statutory requirement, the defendants could have quickly disposed of the material which the officers expected to seize (narcotics), that the destruction of the evidence would have destroyed the utility of the lawful search incident to arrest which they contemplated, and that their actions were, therefore, reasonable under all the circumstances. The Supreme Court agreed, holding

> that in the particular circumstances of this case the officers' method of entry, sanctioned by the law of California, was not unreasonable under the standards of the Fourth Amendment . . .. *Id.* at 41, 83 S.Ct. at 1634.

*Ker* clearly stands, therefore, for the proposition that an unannounced and unconsented entry is not *per se* unconstitutional. The defendants have attempted to distinguish *Ker* by arguing that the entry with which the Court was there concerned was made to effect an arrest, rather than to execute a search warrant, but it is a distinction without a difference. In the first place, the Court in *Ker* noted that because the defendants'

> constitutional protection from unreasonable searches and seizures by police officers is here to be determined by whether the search was incident to a lawful arrest, we are warranted in examining that arrest to determine whether . . . the method of entering the home may offend federal constitutional standards of reasonableness and therefore vitiate the legality of an accompanying search. 374 U.S. at 38, 83 S.Ct. at 1632.

The Court was, therefore, concerned with the search element of the intrusion; this is particularly so as the justification for the entry, prevention of destruction of evidence, went only to the search aspect of the intrusion.

A further indication that the Court's opinion is applicable to both entry to conduct a search and entry to effect an arrest is provided by its discussion of 18 U.S.C. § 3109, the federal statute which deals with the execution of search warrants by federal officers. The Court carefully noted that in determining whether entries in other cases had satisfied the requirements of section 3109 it had never "rejected the proposition that noncompliance may be reasonable in exigent circumstances . . .." 374 U.S. at 40, 83 S.Ct. at 1633.

█ Finally, in a later case the Supreme Court laid to rest any lingering doubts as to the validity of the distinction urged upon this Court by the defendants. In explaining its recent holding in *Osborn v. United States*, 385 U.S. 323, 87 S.Ct. 439, 17 L.Ed.2d 394 (1966) wherein it had upheld a narrowly circumscribed electronic surveillance authorization, the Court stated:

> "Although the protections afforded the petitioner in *Osborn* were '*similar* . . . to those . . . of conventional warrants,' they were not identical. A conventional warrant ordinarily serves to notify the suspect of an intended search. But if Osborn had been told in advance that federal officers intended to record his conversations, the point of making such recordings would obviously have been lost; the evidence in question could not have been obtained. In omitting any requirement of advance notice, the federal court that authorized electronic surveillance in *Osborn* simply recognized, as has this Court, that officers need not announce their purpose before conducting an otherwise authorized search if such an announcement would provoke the escape of the suspect or the destruction of critical evidence." *Katz v. United States*, 389 U.S. 347, 355 n. 16, 88 S.Ct. 507, 513, 19 L.Ed.2d 576 (1967), citing *Ker v. California*, 374 U.S. 23, 37–41, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963) (emphasis in original).

On the strength of the foregoing analysis, this Court holds that Title III's failure to proscribe unconsented and unannounced entries does not render it unconstitutional. This Court further holds that exigent circumstances, including the magistrate's or,

in the case of electronic surveillance, the judge's reasonable belief that compliance with the generally applicable knock and announce requirement would result in the loss of evidence which would otherwise be obtained, may justify a surreptitious, unconsented and unannounced entry, and that such an entry would not be prohibited by the Fourth Amendment. This leaves open two questions: (1) whether an exigent circumstances exception can be read into section 3109; and, (2) if so, whether exigent circumstances existed in the case before this Court.

In a case which was decided shortly after *Katz*, the Supreme Court noted that there is no reason why the knock and notice exceptions which existed at common law should not be applied to section 3109, *Sabbath v. United States*, 391 U.S. 585, 591, n. 8, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1968), and a number of the circuit courts of appeal have expressed their concurrence in this view. *See, e. g., United States v. Mapp*, 476 F.2d 67 (2d Cir. 1973); *Rodriguez v. Jones*, 473 F.2d 599 (5th Cir.), *cert. denied*, 412 U.S. 953, 93 S.Ct. 3023, 37 L.Ed.2d 1007 (1973).

This Court finds itself in full agreement with those courts that have concluded that section 3109 does exist in harmony with the exigent circumstances exception and does not require that a federal officer knock and announce the purpose of and authority for his presence when the officer reasonably believes that to do so would be likely to frustrate the purpose of the search, in this case a search for conversations which would establish the participation of the defendants in an illegal gambling conspiracy. Having come to this conclusion, it is necessary to determine whether exigent circumstances were set out in the affidavits presented to the judge issuing the electronic surveillance order.

The facts of this case make it clear that for the government's electronic surveillance to be successful it was imperative that it be undetected. Had the targets of the surveillance become aware of the fact that Mr. Zalmanowski's car contained a bug, it is obvious that no conversations worth being seized would have occurred at that location. It is equally obvious to this Court that a reasonable belief that evidence will fail to materialize creates circumstances as exigent as a reasonable belief that evidence will be destroyed; when a court finds that an officer reasonably believed that compliance with the knock and announce requirements of section 3109 would result in the occurrence of either of the above-mentioned events, destruction of evidence or its failure to materialize, it should find that the exigent circumstances exception to section 3109 is applicable. Furthermore, in this case it was obvious that not only would compliance with the requirements of section 3109 cause a reasonable belief that the evidence sought would fail to materialize, it would cause an absolutely certain knowledge that it would not materialize. This Court, therefore, holds that the unconsented and unannounced entry into Mr. Zalmanowski's car did not violate section 3109, as exigent circumstances existed which justified noncompliance with the express items of that statute. This Court, therefore, holds that the unconsented and unannounced entry into the automobile did not violate the Fourth Amendment, Title III, or section 3109 and provides no basis upon which the proceeds of that electronic surveillance must be suppressed.[3]

The final basis for suppression asserted by the defendants is that the electronic surveillance device employed in Mr. Zalmanowski's car operated in such a manner as to make the conduct of the surveillance fail to satisfy the minimization requirements of either Title III, 18 U.S.C. § 2518(5), or the authorization order, A–5–24–76–PP at 6. The only facts alleged by the defendants to support their argument are (1) that the

---

**3.** The United States Court of Appeals for the Sixth Circuit has previously held that section 3109 does not apply to non-dwellings. *United States v. Hassell*, 336 F.2d 684, 686 (1964), *cert. denied*, 380 U.S. 965, 85 S.Ct. 1111, 14 L.Ed.2d 155 (1965). Therefore, even if it were to be determined that section 3109 does not incorporate the common law exigent circumstances exception, the entry involved in this case would provide no basis for suppression.

surveillance device placed in the automobile could not be switched off when no FBI agent was monitoring a conversation, (2) that the device transmitted on a frequency that could be picked up on receiving equipment which could be obtained by anyone, and (3) that the range of broadcast for the device was quite large, extending as far as half of a mile under ideal circumstances. The government has acknowledged the truth of these allegations.

■ The particular subsection of Title III which includes the minimization requirement provides that

[e]very order [authorizing the interception of any oral communication] and extension thereof shall contain a provision that the authorization to intercept . . shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter . . .. 18 U.S.C. § 2518(5) (1970).

An immediate reaction to this language is that it simply is not talking about the same type of minimization that the defendants are claiming the government has failed to ensure. The obvious purpose of this subsection is to compel the government to minimize the extent and scope of the intrusion caused by the authorization order by allowing the government to monitor only those conversations particularly described in the order which pertain to the stated offense. Stated another way, this subsection requires the government to cease its monitoring of any oral communication once it has determined that the conversation does not come within the description of conversations for which the order authorizes monitoring.

■ The theory advanced by the defendants would require a finding that the statutory minimization requirement has been violated whenever the government has failed to take all reasonable steps necessary to ensure that members of the general public will not be able to monitor any oral communication broadcast by the electronic surveillance device. Both the words of the entire subsection containing the requirement and that portion of the Senate Report which discusses it, however, indicate that the purpose of the subsection is to place well-defined limits on the quantity and contents of the communications monitored by the government on the basis of an authorization order; the subsection does not appear to be concerned with monitoring performed by the general public. This is not to say that under no circumstances could the government's means of monitoring cause the proceeds to be suppressed, but if that were to be required it would be for the reason that the means employed made the extent of the intrusion unreasonable.

Any argument made to the effect that the means employed in this case were unreasonable would be frivolous. First, any additional intrusion caused by the fact that the transmitter could not be switched off, and none were brought to the attention of this Court, would be *de minimis*. The monitoring of any transmitted conversation by anyone other than an agent would require the occurrence of a number of coincidences. The person would have to be in the vicinity of the transmitter, have the equipment necessary to receive the broadcast and be tuned to the frequency upon which it broadcasts (one of thousands). The possibility that these three events would occur simultaneously is slight, and, even if it were to occur, unless either both the person and the transmitter were both travelling in the same direction or both were not moving at all, the amount of any conversation intercepted would be slight due to the fact that the limited range of the transmitter would place it too far from the interceptor to be received in a very short time.

Second, the severity of the intrusion would be slight for the simple reason that any person who intercepted a communication would in all likelihood have no idea who it was who was being intercepted. This in addition to the fact that the period of the interception would be likely to be brief would cause the severity of any intrusion to be slight, indeed.

Finally, the use of a transmitter that could be shut off when not in use would

38

have the potential to cause more serious intrusions that it would be likely to prevent. An important limitation on the effectiveness of an electronic surveillance device is that "[m]ore often than not, the device, for one reason or another, sometimes technical and sometimes human, will not work." American Bar Association, Standards Relating to Electronic Surveillance 45 (Approved Draft, 1971) (citation omitted). It follows that the more complex the device employed, the more likely it is that a malfunction will occur, and the occurrence of a malfunction would have required an additional surreptitious entry of the vehicle—an intrusion far more severe than a transmitter that could not be turned off could generate and one more likely to occur if the more complex device had been employed.

 For the reasons stated above, it is the opinion of this Court that not only does the statutory minimization requirement not apply to the type of intrusion envisioned by the defendants, but even if it did, the means employed would not run afoul thereof. Furthermore, this Court is of the opinion that an interception can be held unlawful and

"suppression is required only for a 'failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device.' " *United States v. Donovan*, 429 U.S. 413, 433, 97 S.Ct. 658, 671, 50 L.Ed.2d 652 (1977) (citation omitted),

and this is simply not such a failure. This conclusion does not end the Court's inquiry, however, for 18 U.S.C. § 2518(10)(a)(iii) requires suppression whenever "the interception was not made in conformity with the order of authorization or approval." *Id.* The Court, therefore, turns its attention to the order which authorized the surveillance that is challenged.

 The Court's authorization order provided that

"the oral devices, which are to be located in the [vehicle belonging to] Richard

Stanley Zalmanowski . . . shall be activated only when Richard Stanley Zalmanowski [and/or one or more of the other alleged co-conspirators] and/or others as yet unknown are determined by physical surveillance or voice identification to be present inside this vehicle with any of these individuals. Once the oral devices are activated and conversations are intercepted, the interception shall continue only so long as [at least two of those individuals] are participants in those conversations." Order A–5–24–76–PP at 6.

It is apparent that the defendants' attack on the implementation of the order is based entirely on the phrase, "the oral devices [in the vehicle] shall be activated." Their position is that this phrase necessarily requires that the device installed in Mr. Zalmanowski's car be capable of being remotely switched on or off so that it is transmitting only when the device has been activated; failure to install a device with this capability, it is argued, is in and of itself sufficient to justify a finding that the interception was made in violation of 18 U.S.C. § 2518(10)(a)(iii) and thereby requires suppression. This Court does not agree.

The procedures employed by the FBI with respect to the monitoring of conversations transmitted by the bug in Mr. Zalmanowski's car substantially complied with all significant aspects of the authorization order involved. Testimony taken at the hearing on the motion to suppress established that at all times when conversations between two or more of the individuals designated in the order were not being monitored, the receiving equipment was turned off. The purpose of the requirement that the device in the car be activated only when such conversations were taking place was obviously to minimize the scope of the intrusion caused by the presence of the bug, and by shutting off the receiving equipment when it was not being used to monitor conversations which fell within the scope of the order, the FBI ensured the minimization of the intrusion. As this Court's discussion of the statutory minimization re-

quirement makes clear, the intrusion caused by the fact that the device transmitted continuously was *de minimis* if it in fact existed at all. By turning their receiver off when they were not monitoring a conversation which the authorization order empowered them to seize, the FBI agents eliminated any possibility that the intent of the phrase contained in the order, that the intrusion be minimized, would be frustrated. Furthermore, the inclusion in the order of the phrase "the oral devices [in the vehicle] shall be activated" was obviously intended by the judge who issued the order to ensure that the order would require the degree and type of minimization required by the statute. The slight deviation from the literal language of the order involved in this case could not have caused any intrusion which the statutory minimization requirement was intended to preclude. One final point worthy of brief note is that the meaning of the word "activate" is not so clear as to preclude the possibility that the agents who implemented the order believed themselves to be exactly complying with its terms by merely leaving their receiver off when they were not lawfully monitoring a conversation.

For the reasons stated above, this Court concludes that the FBI agents who executed the order substantially complied with each significant requirement contained therein and that that is all that the statute requires. *See United States v. Donovan*, 429 U.S. 413, 433, 97 S.Ct. 658 (1977); *United States v. Chavez*, 416 U.S. 562, 574–75, 94 S.Ct. 1849, 40 L.Ed.2d 380 (1974). *Cf. United States v. Daly*, 535 F.2d 434, 441–42 (8th Cir. 1976); *United States v. Iannelli*, 430 F.Supp. 151, 156 (W.D.Pa.1977). This conclusion causes the Court to hold that neither section 2518(5) nor section 2518(10)(a)(iii) was violated by the type of device installed in Mr. Zalmanowski's car and that the evidence should not be suppressed for noncompliance with the requirements of those two sections.

The motion to suppress evidence derived from the surveillance device was brought on behalf of all of the defendants. In its brief in opposition to the motion to suppress, the government contended that many of the defendants have no standing to object to the electronic surveillance which was thereby conducted, an issue which the Court chose to analyze last due to the fact that it is obvious that at least one of the defendants, Mr. Zalmanowski, has standing. This fact the government admits. Thus, the Court reached the merits.

Three separate orders authorizing the interception of oral communications via the installation of an electronic surveillance device in Mr. Zalmanowski's car were entered: (1) Judge Philip Pratt's order dated May 24, 1976; (2) Judge Robert E. DeMascio's order dated June 17, 1976; and (3) Judge James P. Churchill's order dated August 5, 1976. The government has conceded, and this Court agrees, that (1) Richard Stanley Zalmanowski has standing to object to all three of the orders insofar as they pertain to the bug planted in his car for the reason that he was intercepted during the course of all three intercepts, (2) Elias Koury has standing to object to the order of May 24, 1976, insofar as it pertains to the bug in the automobile for the reason that he was overheard during the course of that intercept, and (3) Kenneth Charles Baker has standing to object to the orders of May 24, 1976 and June 17, 1976, insofar as they pertain to the automobile bug for the reason that he was overheard during the periods that those two orders were in effect. However, the government contends that neither Vito Giacalone nor David Feldman has standing to object to any of the three orders, as neither one was ever overheard, that Elias Koury has no standing to object to the orders of June 17, 1976 and August 5, 1976, insofar as they pertain to the bug, for the reason that he was not overheard during the time that they were in effect, and that Kenneth Charles Baker has no standing to object to the order of August 5, 1976, insofar as it pertains to the bug, for the reason that no conversation in which he was a participant that took place in the automobile was overheard while that order was in effect.

Before reaching the merits of the standing issue it should be noted that

during the hearings that this Court held on the motion to suppress no attempt was made by any of the defendants to establish standing to object to these orders. Prior to the hearings, the attorneys for each of the defendants were afforded the opportunity to listen to the tapes of the intercepted conversations, so they could have brought forward evidence of interceptions of conversations in which any of the defendants participated. They could also have questioned the FBI agents who conducted the surveillance as to whether any conversations in which their clients had participated had been intercepted. They did none of these things, in spite of the fact that it is well established that "Fourth Amendment rights are personal rights which : . . may not be vicariously asserted," *Alderman v. United States*, 394 U.S. 165, 174, 89 S.Ct. 961, 966, 22 L.Ed.2d 176 (1969) (citations omitted), and that to establish standing the defendants must bear "the burden of [proving] . . . an illegal invasion of their particular fourth amendment rights . . ." *United States v. Magaddino*, 496 F.2d 455, 460 (2d Cir. 1974) (standing to contest illegal wiretaps not established by two defendants). Since the defendants failed to establish any infringement of their personal Fourth Amendment rights in addition to those conceded by the government, they lack standing to contest the legality of the authorization orders unless it is conferred upon them by Title III.

Title III provides that an "aggrieved person in any trial, hearing, or proceeding in or before any court . . . of the United States . . . may move to suppress the contents of any intercepted wire or oral communication, or evidence derived therefrom on the grounds that—

(i) the communication was unlawfully intercepted;

(ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or

(iii) the interception was not made in conformity with the order of authorization or approval." 18 U.S.C. § 2518(10)(a).

The term "aggrieved person" is in turn defined by the act to mean "a person who was a party to any intercepted wire or oral communication or a person against whom the interception was directed." 18 U.S.C. § 2510(11). Although the statute makes no reference to the standing of a person with a possessory interest in the premises at which the interception is to occur, it is well established that any person with a possessory interest in the premises does have standing. The Supreme Court established this in *Alderman v. United States* when it held that a defendant's own Fourth Amendment interests would be violated "if the United States unlawfully overheard conversations of a petitioner himself *or conversations occurring on his premises, whether or not he was present or participated in those conversations.*" 394 U.S. at 176, 89 S.Ct. at 968 (emphasis added).

The only one of these bases for standing that it is necessary to examine in this case is the one that grants standing to "a person against whom the interception was directed." 18 U.S.C. § 2510(11). No evidence was introduced at the hearing and none is part of the record that would provide standing other than that to which the government has consented to contest any order by any defendant on the basis of either an overhear or a possessory interest in the premises, and that removes any necessity that this Court consider those bases for standing. *See Jones v. United States*, 362 U.S. 257, 261, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); *United States v. Magaddino, supra; cf. United States v. Hunter*, 550 F.2d 1066, 1073–75 (6th Cir. 1977).

The statutory grant of standing to a person against whom the interception was directed distinguishes statutory standing from the statement of what is necessary to establish standing contained in *Alderman*, but to determine whether this language could benefit the defendants it is necessary to determine whether this difference was intended to expand the concept of standing beyond what is constitutionally required. The phrase contained within the statutory

definition of "aggrieved person" appears to have been derived from language used by the Supreme Court in *Jones v. United States*, 362 U.S. 257, 261, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), and it is with that case that this Court's analysis of the issue will begin.

In *Jones*, the court was concerned with determining who had standing to file a motion to suppress under Rule 41(e) of the Federal Rules of Criminal Procedure, which granted standing to a "person aggrieved by an unlawful search and seizure . . . ." The court held that in order to be a person aggrieved,

> "one must have been a victim of a search or seizure, *one against whom the search was directed*, as distinguished from one who claims prejudice only through the use of evidence gathered as a consequence of a search or seizure directed at someone else." 362 U.S. at 261, 80 S.Ct. at 731 (emphasis added).

In *Alderman*, Justice Fortas filed an opinion, concurring in part and dissenting in part, in which he vigorously argued that the clear import of the language of *Jones* was that if "the government agents conducted their unlawful search and seizure in order to obtain evidence to use against [a person]," 394 U.S. at 209, 89 S.Ct. at 985, that in and of itself would be enough to endow that person with standing. The majority, however, clearly and correctly viewed that phrase in a different manner than did Justice Fortas. The majority obviously considered the phrase "one against whom the search was directed" to be nothing more than a description of who could be a victim of a search as opposed to one who could not. One who could not be considered to be a victim of a search was described in *Jones* as "one who claims prejudice only through the use of evidence gathered as a consequence of a search or seizure directed at someone else." 362 U.S. at 261, 80 S.Ct. at 731.

In drafting 18 U.S.C. § 2518(10)(a), it is clear that Congress lifted the term "aggrieved person" from Fed.R.Crim.P. 41(e), and then defined it in a manner consistent with the Supreme Court's definition

of "person aggrieved" contained in *Jones*. They intended the term "aggrieved person" to be synonymous with the term "victim of a search or seizure," and used the phrase from *Jones* in articulating the statutory definition. It is clear, therefore, that the statutory definition of "aggrieved person" is meant to do no more than grant standing to the same class of defendants that would be entitled to standing under the Supreme Court's decision in *Jones*.

The conclusion that Congress did not intend to expand the concept of standing beyond what was required by the Constitution is borne out by the legislative history of Title III. In discussing section 2510(11), the Senate Report stated that it

> "defines 'aggrieved person' to mean any person who was a party to any intercepted wire or oral communication or a person against whom the interception was directed. The definition defines the class of those who are entitled to invoke the suppression sanction . . . through the motion to suppress provided for by section 2518(10)(a) . . . . *It is intended to reflect existing law*." S.Rep. No. 1097, 90th Cong., 2d Sess. ___, U.S. Code Cong. & Admin.News, pp. 2179–80 (1968), *citing Jones v. United States, supra* (emphasis added).

The existing law was shortly thereafter interpreted as providing standing to one only "if the United States . . . overheard [his] conversations . . . or conversations occurring on his premises, whether or not he was present or participated in those conversations." *Alderman v. United States*, 394 U.S. at 176, 89 S.Ct. at 968.

The above discussion causes this Court to conclude that in passing section 2510(11) Congress did not intend to confer standing to object to electronic surveillance to anyone other than those whose conversations were overheard and those whose premises were subjected to electronic surveillance. *See Alderman v. United States, supra; Jones v. United States, supra; United States v. Hunter, supra;* J. Carr, The Law of Electronic Surveillance § 6.02[1] (1977). This conclusion is reinforced by the treat-

ment accorded a proposed amendment to Title III which was offered by the late Senator Philip Hart and which would have provided standing to anyone against whom evidence obtained through electronic surveillance was sought to be introduced. The amendment was defeated, 114 Cong.Rec. 12508 (1968), a fact which indicates that Congress intended to restrict standing to the narrowest limits possible under the Constitution. It is further reinforced by the realization that this conclusion leaves the phrase "person against whom the interception was directed" with a logical meaning; it means those persons whose premises were to be searched via electronic surveillance.

■ Turning to the individual defendants, David Feldman was not named in any order as a person whose conversations were likely to be intercepted, and no conversation of his was in fact intercepted. Under the definition of standing held proper by this Court, he has shown no basis upon which it could be held that he has standing, and this Court, therefore, holds that David Feldman lacks standing to object to any of the authorization orders.

With respect to Vito Giacalone, his only claim for standing must rest on the fact that in the first application and the first authorization order he was named as a person whose conversations were likely to be overheard. However, no conversation of his was ever overheard and no showing or claim was made that he had a possessory interest in Mr. Zalmanowski's automobile. This Court, therefore, holds that Vito Giacalone does not have standing to object to any of the authorization orders.

Elias Koury was listed as a person whose conversations were likely to be overheard on all three applications and all three authorization orders, but he was only overheard during the course of the interceptions made pursuant to the first order. Neither a claim nor a showing was made that he had a possessory interest in the vehicle. This Court holds that Elias Koury has standing to attack the validity of the first order. It further holds that the fact that he was listed as a person whose conversa-

tions were likely to be intercepted is not enough to endow him with standing and that he does not have standing to attack the validity of either the second or third order.

Kenneth Charles Baker was overheard during the course of the interceptions conducted pursuant to the first two orders, and this Court holds that he has standing to attack the validity of those two orders. He was listed as a person likely to be overheard on the third application and in the third order, but he was not overheard and has neither claimed nor shown that he had a possessory interest in the vehicle. This Court, therefore, holds that Kenneth Charles Baker does not have standing to contest the validity of the third order.

In summary, this Court holds that the orders have not been shown to have resulted in any unlawful interceptions. It further holds that neither Vito Giacalone nor David Feldman has standing to object to any of the orders, that Kenneth Charles Baker does not have standing to object to the order of August 5, 1976, and that Elias Koury does not have standing to object to either the order of June 17, 1976 or the order of August 5, 1976. For all the reasons stated above, the motion to suppress evidence derived from the electronic surveillance device installed in Mr. Zalmanowski's car IS DENIED.

IT IS SO ORDERED.