**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Dave FELDMAN, Richard Zalmanowski, and Kenneth Baker, Defendants-Appellants.**

**Nos. 78–5312 to 78–5314.**

United States Court of Appeals, Sixth Circuit.

Argued April 4, 1979.

Decided Sept. 26, 1979.

Rehearing and Rehearing En Banc Denied Dec. 6, 1979.

---

N. C. DeDay LaRene, Detroit, Mich., for defendants-appellants in No. 78–5312.

James K. Robinson, U. S. Atty., Detroit, Mich., C. Stanley Hunterton, Detroit, Mich., Karen A. Rebrovich, Dept. of Justice, Washington, D.C., for plaintiff-appellee in all three cases.

Philip J. Hirschkop, Victor M. Glasberg, Alexandria, Va., for defendants-appellants in No. 78–5313.

T. George Gilinsky, Washington, D. C., for plaintiff-appellee in No. 78–5313.

James C. Thomas, Royal Oak, Mich., for defendants-appellants in No. 78–5314.

Before CELEBREZZE and LIVELY, Circuit Judges, and PHILLIPS, Senior Circuit Judge.

CELEBREZZE, Circuit Judge.

These cases are before the court on direct appeal from judgments of conviction entered upon jury verdicts against appellants Dave Feldman, Richard Zalmanowski, and Kenneth Baker for conducting an illegal gambling business and conspiracy to commit that offense, in violation of 18 U.S.C. §§ 1955, 371, and 2.[1] These consolidated appeals raise a number of issues relating to the validity and effect of three court orders issued pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968[2] authorizing wiretaps of several telephones and the surreptitious entry into appellant Zalmanowski's automobile for the purpose of installing, servicing, and removing an electronic listening device. The Government's proof against appellants was largely derived from the electronic surveillance. Each appellant filed appropriate pre-trial motions to suppress the evidence gathered by the electronic surveillance. The district court denied appellants' motions. 455 F.Supp. 26 (E.D.Mich.1977).[3]

Appellants raise the following allegations concerning the validity of the interceptions:

1. The evidence derived from the electronic surveillance equipment installed in Zalamanowski's automobile was improperly admitted into evidence in view of the district court's inability, consistent with the fourth amendment and Title III, to authorize a surreptitious entry for the purpose of installing an electronic listening device. Furthermore, the failure on the part of monitoring agents to comply with the minimization requirements of Title III with respect to the Zalmanowski bug also requires suppression.

2. The district court erred in refusing to suppress evidence obtained from a

---

1. Vito Giacalone and Elias Koury were also indicted on both counts of the indictment. The district court impaneled two separate juries, one to try Giacalone and the other to try the three appellants and defendant Koury. Giacalone was found not guilty on December 16, 1977. Koury was convicted on both counts with appellants on December 20, 1977. Koury is not involved in this appeal.

2. 18 U.S.C. §§ 2510 et seq.

3. On August 19, 1977, the district court issued two opinions and orders denying various motions to suppress evidence. One of these opinions is reported at 455 F.Supp. 26 (E.D.Mich. 1977). The other opinion was not reported. See App. 170.

wiretap of a telephone line not authorized to be intercepted.

3. The second two surveillance orders were improperly issued extensions of the first surveillance order and therefore the evidence derived from the second two orders must be suppressed.

For the reasons stated below we reject each of the above contentions and affirm the convictions.

## I.

On May 24, 1976, the district court issued an order pursuant to Title III authorizing the interception of wire communications on six telephone lines [4] and the interception of oral communications taking place in a 1976 Lincoln Continental leased and operated by Zalmanowski. This order specifically authorized FBI agents to "surreptitiously enter the foregoing vehicle [the 1976 Lincoln Continental] for the purpose of installing, maintaining, and removing any such oral interception devices utilized pursuant to the authority granted." This order required termination of interception within twenty days or upon attainment of the authorized objective, minimization of interceptions, and five, ten and fifteen day progress reports.

On June 17, 1976, the district court granted the Government's request for permission to intercept telephone conversations on five telephone lines, two of which were included in the May 24 order,[5] and oral communications taking place in the 1976 Lincoln Conti-

nental. This order contained the same termination, minimization, and progress report requirements as the May 24 order. On June 25, 1976, the Government voluntarily terminated interception pursuant to the June 17 order when it discovered that FBI agents were intercepting conversations taking place on a "bootleg telephone"[6] instead of conversations taking place on the telephone line they had intended to tap.

On August 5, 1976, the district court issued a third interception order authorizing the interception of oral communications taking place in the Lincoln Continental, the wiretap of two telephone lines in Zalmanowski's residence, and two telephones in the Bruno residence. This third order also required similar termination, minimization, and progress reports.

## II.

■ One of appellants' primary contentions on appeal relates to the evidence derived from the electronic listening device (bug) installed in Zalmanowski's automobile. Appellants assert that the district court lacked authority under Title III and the fourth amendment to authorize FBI agents to surreptitiously enter Zalmanowski's automobile in order to install and remove the bug. Appellants argue that since installation of the bug in Zalmanowski's automobile was in violation of Title III and the fourth amendment the district court erred in failing to suppress the evidence derived from the bug. We disagree.[7]

---

**4.** Two of the telephone lines were listed to Kenneth and Dennis Bruno and were located at 17404 O'Conner, Allen Park, Michigan. Two of the telephone lines were listed to Charles Cotton and Lela Jackson and were located at 20486 Steel, Detroit, Michigan. The remaining two telephone lines were listed to Moon Shell Service Station located at 13824 Livernois, Detroit, Michigan. The Government had probable cause to believe Louise Bruno, an unindicted co-conspirator was using the Bruno phones for gambling transactions. Charles Cotton, also an unindicted co-conspirator, was believed to be using his telephones and the service station telephones for gambling purposes.

**5.** Pursuant to the June order wire interception was initiated on three telephones used by Zal-

manowski. The June order also included authorization to tap the two Bruno telephones included in the May 24 order. The Bruno telephones are the telephones involved in the "bootleg phone" issue. *See* notes 13–17 *infra*, and accompanying text.

**6.** A "bootleg" telephone is an illegally installed extension connected to a telephone line not listed to the owner of the illegal extension. Its purpose is to avoid electronic surveillance by using a telephone line which authorities would not suspect is being used for criminal activity.

**7.** The Government argues that only appellant Zalmanowski has standing to raise this contention. In light of our disposition of the issues involved and the Government's concession of

Appellants rely on this court's original decision in *United States v. Finazzo*, 583 F.2d 837 (6th Cir. 1978), *vacated and remanded*, —— U.S. ——, 99 S.Ct. 2047, 60 L.Ed.2d 657 (1979), as direct support for their position. In our decision in *Finazzo* a majority of the court held that no authority exists in Title III permitting a surreptitious entry by officials in order to install an electronic listening device. The court further held that no constitutional authority exists to authorize surreptitious entries in absence of statutory authority. *Id.* at 850. Our position in *Finazzo*, however, was specifically rejected by the Supreme Court in *Dalia v. United States*, —— U.S. ——, 99 S.Ct. 1682, 60 L.Ed.2d 177 (1979).

The Supreme Court in resolving a conflict among the circuits[8] held in *Dalia* that "[t]he Fourth Amendment does not prohibit per se a covert entry performed for the purpose of installing otherwise legal electronic bugging equipment." *Id.* at ——, 99 S.Ct. at 1689. The Court further held that Title III authorizes the use of a surreptitious entry in order to install a bug and that Congress clearly understood it was conferring power upon the courts to authorize surreptitious entries when it enacted Title III. *Id.* at ——, 99 S.Ct. at 1689–92. In view of the Supreme Court's express holdings in *Dalia* and its subsequent vacation of our opinion in *Finazzo*, no constitutional or statutory rights maintained by the

appellants were violated by the surreptitious entry into the 1976 Lincoln Continental.

The appellants further assert with respect to the evidence derived from the bug placed in Zalmanowski's automobile that it should be suppressed for the reason that FBI monitoring agents failed to comply with the minimization requirements of the district court order and of Title III.[9] Specifically, appellants argue that the monitoring agents violated the district court order by installing a bugging device which could not be deactivated by remote control when conversations not otherwise subject to seizure took place in the automobile. Appellants further submit that the bugging device broadcast on a frequency which was accessible to public reception and therefore the bug "broadcast to the world" the conversations taking place in the automobile. It is the nature of the electronic listening device selected for use in the vehicle, not the failure on the part of monitoring agents to cease monitoring conversations not otherwise subject to interception, which is the primary basis of appellants' allegations.

■ In *Scott v. United States*, 436 U.S. 128, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978), the Supreme Court articulated the appropriate standard to be applied in determining whether monitoring agents have complied with the minimization requirements of Title III. The Court held that the proper ap-

Zalmanowski's standing, we need not decide the issue of standing with respect to the other appellants. Irrespective of the other appellants' standing, we would be required to decide this issue on the merits. *See Scott v. United States*, 436 U.S. 128, 135–36 n. 10, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978); *California Bankers Assn. v. Shultz*, 416 U.S. 21, 44–45, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974); *Doe v. Bolton*, 410 U.S. 179, 189, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973). *See also Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

While Zalmanowski only leased the 1976 Lincoln Continental, we see no distinction of a constitutional dimension between owning and leasing an automobile for purposes of standing upon the facts of this case.

8. *See United States v. Finazzo*, 583 F.2d 837 (6th Cir. 1978), *vacated and remanded*, —— U.S. ——, 99 S.Ct. 2047, 60 L.Ed.2d 657 (1979); *United States v. Santora*, 583 F.2d 453 (9th Cir.

1978), *vacated and remanded*, —— U.S. ——, 99 S.Ct. 2155, 60 L.Ed.2d 1041 (1979); *United States v. Scafidi*, 564 F.2d 633 (2d Cir. 1977), *cert. denied*, 436 U.S. 903, 98 S.Ct. 2231, 56 L.Ed.2d 401 (1978); *United States v. Ford*, 180 U.S.App.D.C. 1, 553 F.2d 146 (D.C.Cir. 1977); *United States v. Agrusa*, 541 F.2d 690 (8th Cir. 1976), *cert. denied*, 429 U.S. 1045, 97 S.Ct. 751, 50 L.Ed.2d 759 (1977).

9. U.S.C. § 2518(5) provides in pertinent part:
   Every order and extension thereof shall contain a provision that the authorization to intercept shall be executed as soon as practicable, shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter, and must terminate upon attainment of the authorized objective, or in any event in thirty days.

proach for evaluating compliance with the minimization requirement is to objectively assess the reasonableness of the monitoring agents' actions in light of the facts and circumstances confronting them at the time. The focus of the inquiry is to be upon the agents' actions, not their motives or intent, in conducting the surveillance.[10] *Id.* at 135–38, 98 S.Ct. 1717.

Many courts in applying the reasonableness test adopted by the Supreme Court in *Scott* have considered three factors in reviewing the Government's attempts to minimize electronic surveillance; the nature and scope of the criminal investigation; the Government's reasonable expectations of the character of conversations; and, the extent of judicial supervision over the surveillance. *See United States v. Hyde*, 574 F.2d 856 (5th Cir. 1978); *United States v. Clerkley*, 556 F.2d 709 (4th Cir. 1977), *cert. denied*, 436 U.S. 930, 98 S.Ct. 2830, 56 L.Ed.2d 775 (1978); *United States v. Abascal*, 564 F.2d 821 (9th Cir. 1977), *cert. denied*, 435 U.S. 942, 98 S.Ct. 1521 (1978); *United States v. James*, 161 U.S.App.D.C. 88, 494 F.2d 1007 (D.C.Cir.), *cert. denied*, 419 U.S. 1020, 95 S.Ct. 495, 42 L.Ed.2d 294 (1974). The fourth and second circuits have phrased the inquiry in the following way: "[t]he [minimization] statute is deemed to be satisfied if 'on the whole the agents have shown a high regard for the right of privacy and have done all they reasonably could to avoid unnecessary intrusion.'" *United States v. Clerkley*, 556 F.2d 709, 716 (4th Cir. 1977), *quoting United States v. Tortorello*, 480 F.2d 764, 784 (2d Cir.), *cert. denied*, 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973).

██ When confronted with appellants' arguments on this issue the district court made the following findings:

> Any argument made to the effect that the means employed in this case were unreasonable would be frivolous. First,

any additional intrusion caused by the fact that the transmitter could not be switched off, and none were brought to the attention of this Court, would be *de minimis.* The monitoring of any transmitted conversation by anyone other than an agent would require the occurrence of a number of coincidences. The person would have to be in the vicinity of the transmitter, have the equipment necessary to receive the broadcast and be tuned to the frequency upon which it broadcasts (one of thousands). The possibility that these three events would occur simultaneously is slight, and, even if it were to occur, unless either both the person and the transmitter were both travelling in the same direction or both were not moving at all, the amount of any conversation intercepted would be slight due to the fact that the limited range of the transmitter would place it too far from the interceptor to be received in a very short time.

Second, the severity of the intrusion would be slight for the simple reason that any person who intercepted a communication would in all likelihood have no idea who it was who was being intercepted. This in addition to the fact that the period of the interception would be likely to be brief would cause the severity of any intrusion to be slight, indeed.

Finally, the use of a transmitter that could be shut off when not in use would have the potential to cause more serious intrusions than it would be likely to prevent. An important limitation on the effectiveness of an electronic surveillance device is that "[m]ore often than not, the device, for one reason or another, sometimes technical and sometimes human, will not work." American Bar Association, Standards Relating to Electronic Surveillance 45 (Approved Draft, 1971) (citation omitted). It follows that the

---

10. "This is not to say, of course, that the question of motive plays absolutely no part in the suppression inquiry. On occasion, the motive with which the officer conducts an illegal search may have some relevance in determining the propriety of applying the exclusionary rule." *Scott v. United States*, 436 U.S. 128, 139 n. 13, 98 S.Ct. 1717, 1724 n. 13, 56 L.Ed.2d 168 (1978). But the assessment and use of motive is irrelevant to our analysis of whether monitoring agents violated minimization requirements. *Id.*

more complex the device employed, the more likely it is that a malfunction will occur, and the occurrence of a malfunction would have required an additional surreptitious entry of the vehicle—an intrusion far more severe than a transmitter that could not be turned off could generate and one more likely to occur if the more complex device had been employed.

455 F.Supp. at 37–38. The district court applied the correct legal standard and we cannot conclude that its findings are clearly erroneous.[11] Appellants have failed to display that the monitoring agents exhibited a high disregard for appellants' privacy rights or that they did not do all they reasonably could to avoid unnecessary intrusions.[12]

### III.

Appellants further contend that the trial court erred when it refused to suppress evidence derived from a wiretap of a "bootleg telephone"[13] located in the Bruno residence. The line to which the "bootleg" phone was connected was installed by the telephone company at a home directly behind the Bruno residence. Without the knowledge of the telephone company this neighboring line was brought into the Bruno residence by an ordinary wire attached

to the neighboring line which ran between the backyards.[14] Pursuant to proper procedure and based upon appropriate affidavits, the Government secured authorization to wiretap the two telephone lines properly listed to the Brunos. The wiretap orders specifically listed the telephone numbers of the lines to be tapped. According to all available telephone company records, the Brunos had only two telephones in their residence.

Upon the installation of the wiretap the Government tapped one of the lines specifically listed in the order, and by mistake and mere coincidence tapped the line to which the "bootleg" phone was connected.[15] Appellants submit that since the "bootleg" telephone number was not specifically listed in the wiretap order the Government lacked authority to tap that line; therefore, the argument continues, all evidence derived from the wiretap of the "bootleg" phone must be suppressed.

The district court refused suppression on the basis that probable cause did exist to wiretap each telephone located in the Bruno residence, including the "bootleg" phone, and that nothing in the language of Title III requires the Government to specify the telephone numbers of the telephone lines it seeks to tap. The district court further

11. It is well settled that in seeking suppression of evidence the burden of proof is upon the defendant to display a violation of some constitutional or statutory right justifying suppression. In the instant case appellants contend that the device used in Zalmanowski's automobile was such as to allow the "whole world" to overhear the conversation. Appellants did not present any evidence to the district court that any member of the public actually overheard any conversations taking place in the automobile. Appellants have attempted to submit such proof to this court through affidavits executed on February 8, 1979 and attached to their reply brief. The proper practice would have been to introduce or proffer such evidence to the district court so that it would have been properly included in the record on appeal. In light of appellants' failure to include those affidavits in the record, we may not consider them here.

12. Though the record is not extensive on this point, considering the fact that this case resulted from a criminal investigation of significant dimensions and the fact that the district court

closely scrutinized the surveillance through the use of five, ten, and fifteen day progress reports, we cannot conclude that the district court inappropriately determined that the utilization of a device which could not be deactivated was reasonable upon the facts of this case.

13. See note 6, supra.

14. The record is silent on the knowledge of the neighbor concerning the existence of the "bootleg" telephone.

15. When the FBI agent installed the wiretap he initiated a series of tests designed to insure that he was indeed tapping the correct telephone line. These tests led the agent to reasonably believe he was on the correct telephone line. For example, he actually heard a woman discussing what appeared to be gambling business. The FBI agent, anxious to complete the tap for security purposes, assumed he had the correct line. See Tr. of Motion to Suppress, Vol. I, 38–40.

held that even if Title III so required the particularization of telephone numbers in the wiretap order suppression was not required in view of the fact that " '[not] every failure to comply fully with any requirement provided in Title III would render the interception of wire or oral communications "unlawful." ' " *United States v. Donovan,* 429 U.S. 413, 433, 97 S.Ct. 658, 671, 50 L.Ed.2d 652 (1977), *quoting United States v. Chavez,* 416 U.S. 562, 574–75, 94 S.Ct. 1849, 40 L.Ed.2d 380 (1974). Relying on *Donovan* the district court found that since the Government did not fail " 'to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device,' " 429 U.S. at 433–34, 97 S.Ct. at 671 *quoting United States v. Giordano,* 416 U.S. 505, 527, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974), suppression was not required. We agree.

The major flaw in the appellants' position is the contention that the Government lacked authority to tap the "bootleg" telephone. Initially it is important to note that the district court found the wiretap applications contained sufficient information to establish probable cause to wiretap any telephone located in the Bruno residence. Moreover, nothing in the language of Title III requires the Government in its application or the district court in its order to include the number of the telephone line that is to be tapped.

■ Section 2518(4) of Title 18 specifies what must be included in a wiretap order:

Each order authorizing or approving the interception of any wire or oral communication shall specify—

(a) the identity of the person, if known, whose communications are to be intercepted;

(b) the nature and location of the communications facilities as to which,

or the place where, authority to intercept is granted;

(c) a particular description of the type of communication sought to be intercepted, and a statement of the particular offense to which it relates;

(d) the identity of the agency authorized to intercept the communications, and of the person authorizing the application; and

(e) the period of time during which such interception is authorized, including a statement as to whether or not the interception shall automatically terminate when the described communication has been first obtained.

The wiretap orders in the instant case fully complied with the above particularization requirements. We can find no authority to support appellants' position that the inclusion of telephone numbers to identify telephone lines to be tapped is required by the particularization requirements of either the fourth amendment or Title III.[16] We conclude, as did the district court, that the wiretap authorization had as "its clear purpose" the authorization to tap "all telephones in the Bruno home," and that the addition or deletion of telephone numbers in the wiretap order had no constitutional or statutory significance.

■ Assuming, *arguendo,* that the procedures of Title III required the articulation of the telephone number of the "bootleg" telephone in the authorization order, the failure to include that number in the authorization order does not render the interception unlawful. In *United States v. Donovan,* 429 U.S. 413, 433–34, 97 S.Ct. 658, 671, 50 L.Ed.2d 652 (1977), the Supreme Court stated that suppression is required only for a failure to satisfy those Title III requirements that "directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary device." *Accord United States v. Giordano,* 416 U.S. 505,

---

16. *Cf. United States v. Sklaroff,* 506 F.2d 837 (5th Cir.), *cert. denied,* 423 U.S. 874, 96 S.Ct. 142, 46 L.Ed.2d 105 (1975).

527, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974). We do not feel the failure to list the *unknown* [17] "bootleg" telephone number in the authorization order resulted in a failure to satisfy a statutory requirement which Congress implemented in order to insure electronic surveillance would only be used in situations "clearly calling" for its use. Assuming, as we do here, that Title III requires the particularization of telephone numbers in the authorization order, nothing in the language or history of Title III suggests that Congress intended this particularization to play "a central, or even functional, role in guarding against unwarranted use of wiretapping or electronic surveillance." *United States v. Chavez*, 416 U.S. 562, 578, 94 S.Ct. 1849, 1857, 40 L.Ed.2d 380 (1974). Therefore, we conclude that the failure to list the "bootleg" telephone number in the authorization order did not deprive the Government of authority to tap that telephone line and, even if Title III mandates such particularization, the failure to so include the telephone number is not the sort of Title III violation which requires suppression.

## IV.

■ The appellants further contend that the second two wiretap orders were improperly issued extensions of the first wiretap order and therefore all evidence seized through the authorization granted in those orders should have been suppressed. [18] Appellants assert that the Government failed to comply with 18 U.S.C. §§ 2518(1)(f) and (5) which set out additional prerequisites necessary for securing an extension order. We disagree. [19]

In an application for an extension order § 2518(1)(f) requires the Government to include "a statement setting forth the results thus far obtained from the interception, or a reasonable explanation of the failure to obtain such results." [20] As the Supreme Court stated in *United States v. Giordano*, 416 U.S. at 532, 94 S.Ct. at 1834,

an extension order could validly be granted *only* upon an application complying with subsection (1) of § 2518. Subsection (1)(e) requires that the fact of prior applications and orders be revealed, and (1)(f) directs that the application set out either the results obtained under the prior order or an explanation for the absence of such results. Plainly the function of § 2518(1)(f) is to permit the court realistically to appraise the probability that relevant conversations will be overheard in the future. If during the initial period, no communications of the kind that had been anticipated had been overheard, the Act requires an adequate explanation for the failure before the necessary findings can be made as a predicate to an extension order.

17. The district court found that the existence of the "bootleg" telephone was not known by the Government agent at the time the wiretaps were installed. App. 173. We render no opinion as to whether knowledge of the existence of the "bootleg" phone would have affected the instant suppression inquiry. *See also United States v. Donovan*, 429 U.S. 413, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977).

18. The problems relating to standing are identical to those discussed above. *See* note 7, *supra*.

19. 18 U.S.C. §§ 2518(1)(f) and (5) set out additional prerequisites for wiretap orders only where the application is for an extension of a previous order. The Government strenuously argues that the June and August orders were not extensions since they involved additions of new suspects and several new telephones. *There is support for the Government's position.*

*See United States v. Wac*, 498 F.2d 1227, 1231 (6th Cir. 1974). We choose, however, not to decide this issue on that basis.

20. 18 U.S.C. § 2518 provides in pertinent part:

(1) Each application for an order authorizing or approving the interception of a wire or oral communication shall be made in writing upon oath or affirmation to a judge of competent jurisdiction and shall state the applicant's authority to make such application. Each application shall include the following information:

\* \* \* \* \* \*

(f) where the application is for the extension of an order, a statement setting forth the results thus far obtained from the interception, or a reasonable explanation of the failure to obtain such results.

Upon a review of the applications submitted by the Government for the June and August wiretap orders not only was the district court appraised of the existence of prior wiretap orders, but it was also provided with excerpts of prior intercepted conversations. We conclude, therefore, that the requirements of § 2518(1)(f) were fulfilled and that the district court was in possession of sufficient information to "permit the court realistically to appraise the probability that relevant conversations [would] be overheard in the future." *Id.*

## V.

For the foregoing reasons we conclude that the district court appropriately denied all motions to suppress. The appellants have raised other issues on this appeal. We have considered each one and find them to be without merit.

Accordingly, the judgments of conviction are affirmed.

LIVELY, Circuit Judge, concurring in part and dissenting in part.

I concur with the majority on all issues except failure to observe the minimization requirements of the surveillance orders. The device which was installed in the Lincoln Continental was not a wiretap, but was a radio transmitter. With a wiretap the conversations are overheard only by authorized persons who are directly connected to the tapped line. The device used to eavesdrop on conversations in the Zalmanowski car had a range of approximately one-half mile and could have been picked up by anyone within that distance whose receiver was on the same frequency.

Each of the two orders authorizing the interception of communications in Zalmanowski's automobile provided:

that this authorization to intercept wire and oral communications . . . shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under Chapter 119 of Title 18 of the United States Code . . .

PROVIDING FURTHER, that the oral devices . . . shall be activated only when [the suspects] are determined by physical surveillance or voice identification to be present inside this vehicle with any of these [suspects]. Once the oral devices are activated and conversations are intercepted, the interception shall continue only so long as [the suspects] are participants in those conversations.

These provisions were included in the orders in compliance with 18 U.S.C. § 2518(5) (1976), which requires minimization in general terms.

In spite of these minimization requirements, the device which was installed in the Zalmanowski car had no shutoff capability. The bug was always "on" and every conversation was broadcast in full. The agents conducting the surveillance did not activate the device only when suspects were determined to be inside the automobile. Though the agents may have discontinued listening when it was not determined that the suspects were participants in intercepted conversations, they had no means of terminating the broadcasts and preventing interception of irrelevant conversations by others.

The constitutionally mandated requirements for electronic surveillance were adopted and elaborated by Congress in Title III of the Omnibus Crime Control and Safe Streets Act of 1968. See *Senate Report* No. 90–1097, Committee on Judiciary (April 29, 1968), reprinted in 1968 *U.S.Code Cong. & Adm.News*, pp. 2112, 2153 (citing *Berger v. New York*, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967) and *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)).

Minimization of the scope of an electronic intrusion is a critical aspect of the statutory scheme and of constitutional compliance. The purpose of the minimization requirement is to avoid intrusions into private communications not reasonably related to the criminal investigation. Without limits, a warrant for a "search and seizure" of private communications becomes a "general search" equivalent to the "general warrants" which prompted the careful drafting

of the Fourth Amendment and partly motivated the Declaration of Independence. *Berger,* 388 U.S. at 58, 87 S.Ct. 1873.

The means of conducting the interceptions of conversations in the Zalmanowski car did not comply with the plain and literal requirements of the court order. No search is reasonable within the meaning of the Fourth Amendment if it is conducted in a way which violates the terms of the court order required to authorize it. The authority to conduct electronic surveillance accrues solely from the authorizing order of a judicial officer. This is an important feature of both the constitutional law of electronic searches and of the statutory scheme.

As the court stated in *United States v. James,* 161 U.S.App.D.C. 88, 102, 494 F.2d 1007, 1021 (D.C.Cir.), *cert. denied sub nom Tantillo v. United States,* 419 U.S. 1020, 95 S.Ct. 495, 42 L.Ed.2d 294 (1974), "The most striking feature of Title III is its reliance upon a judicial officer to supervise wiretap operations." And the statute specifically provides that a ground for suppression of evidence obtained by electronic surveillance is that "the interception was not made in conformity with the order of authorization or approval." 18 U.S.C. § 2518(10)(iii); see also *United States v. Donovan,* 429 U.S. 413, 432–34, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977). Moreover, the clear import of *Berger, supra,* is that such surveillance inherently is too broadly intrusive and thus is an unreasonable search under the Fourth Amendment without careful limitations prescribed by a judge.

It is true that the appellants produced no proof that conversations in the car were overheard by anyone other than monitoring agents. Nevertheless, it is hard to conceive of a more flagrant breach of the right of privacy than to have one's conversations broadcast at large without his knowledge or consent. I find no basis in the record for the district court's speculation that a more serious intrusion would have occurred if the agents had complied with the minimization requirements and installed a "bug" which could have been deactivated when conversations unrelated to the investigation were taking place.

The government's argument that the detection and transmission of conversations was not an "interception" within the meaning of 18 U.S.C. § 2510(4) is not persuasive. The statute defines an interception as "the aural acquisition of the contents of any wire or oral communication through the use of any electronic, mechanical, or other device." *Id.* In *United States v. Turk,* 526 F.2d 654, *cert. denied,* 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976), the Fifth Circuit rejected an interpretation of "interception" which would require both acquisition of the contents of the communication by the device and actual contemporaneous hearing of the communication by the person conducting the monitoring. Rather, an intercept occurs when the device detects the communication and its contents are then transmitted, heard, or preserved by recordation for later listening. 526 F.2d at 658 and nn. 2–4.

In my view none of the circuit court cases cited in the majority opinion covers the issue in the present case. None involved the use of a device without cutoff capability which indiscriminately broadcast all conversations which took place in private property. Though the majority opinion correctly states the holding of *Scott v. United States,* 436 U.S. 128, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978), I do not believe that *Scott* supports the result which the majority reaches. A crucial requirement here was that the agents use a device which could be deactivated when irrelevant, personal conversations were detected. This was clearly required by the court orders. The result of their failure to follow the order was a serious, unauthorized intrusion.

I would reverse the district court's denial of the motion to suppress evidence obtained from "bugging" the Zalmanowski automobile.