**UNITED STATES of America**

v.

**Reginald LYONS, a/k/a Reggie, a/k/a Casper, and Willie Renaldo Royster.**

**Crim. No. M–80–0349.**

United States District Court,
D. Maryland.

Jan. 26, 1981.

Price O. Gielen, Asst. U. S. Atty., Baltimore, Md., for plaintiff.

Michael I. Gilbert, Towson, Md., and Sanford Z. Berman, Hyattsville, Md., for defendants.

## MEMORANDUM AND ORDER

JAMES R. MILLER, Jr., District Judge.

The defendants in this narcotics conspiracy case[1] have moved to suppress certain evidence obtained by the government through a Title III interception order. 18 U.S.C. §§ 2510 to 2520. The order, which was issued by Judge Howard of this Court on April 11, 1980, authorized the interception of wire communications of John C. Anderson and others[2] to and from the telephones located at Anderson's residence in Landover, Maryland. Defendants have raised numerous challenges to the interception order and the evidence obtained through its use.

██ As one court noted recently, it is essential that courts remain "sensitive to the fact that '[f]ew threats to liberty exist which are greater than that posed by the use of eavesdropping devices.'" *United States v. Clemente*, 482 F.Supp. 102, 106 (S.D.N.Y.1979), *quoting Berger v. New York*, 388 U.S. 41, 63, 87 S.Ct. 1873, 1885, 18 L.Ed.2d 1040 (1967). Consequently, in determining whether a particular interception order comports with Title III's "accommodation between [the] competing goals of crime control and [the] protection of the right to privacy," *United States v. Clerkley*, 556 F.2d 709, 712 (4th Cir. 1977), *cert. denied sub nom. Shade v. United States*, 436 U.S. 930, 98 S.Ct. 2830, 56 L.Ed.2d 775 (1978), it is necessary to consider that in enacting Title III[3] "the protection of priva-

---

1. The wiretap at issue in this case is also involved in three other criminal prosecutions in this District. *See United States v. Hudson*, Criminal No. JH–80–0347; *United States v. White*, Criminal No. J–80–0348; *United States v. Mallory*, 507 F.Supp. 99 (Md.1981).

2. The order also identified Sherman B. Mallory, Reedo E. Corbitt, Coleman P. McCown, Jo Anna Davis, and "others yet unknown."

3. "The Act represents a comprehensive attempt by Congress to promote more effective control of crime while protecting the privacy of individual thought and expression." *United States v. United States District Court*, 407 U.S.

cy was an overriding congressional concern." *Gelbard v. United States*, 408 U.S. 41, 48, 92 S.Ct. 2357, 2361, 33 L.Ed.2d 179 (1972) (footnote omitted). *See United States v. Cianfrani*, 573 F.2d 835, 855 (3d Cir. 1978). With these principles in mind the court will consider defendants' contentions.

### I. Probable Cause To Authorize Interception

■ Defendant Royster contends that the application for the interception order, along with the supporting affidavit, did not set out facts sufficient to satisfy Title III's three-prong probable cause test. Under Title III, the application and the supporting affidavit must establish probable cause as to three sets of facts:

> "[T]he judge may enter an ex parte order . . . if the judge determines on the basis of the facts submitted by the applicant that—
>
> (a) there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in . . . this chapter;
>
> (b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception; . . .
>
> (d) there is probable cause for belief that the facilities from which, or the place where, the wire or oral communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the

name of, or commonly used by such person."

18 U.S.C. § 2518(3).

The affidavit submitted by DEA Special Agent W. Alfred Williams (Paper No. 28, Ex. 1(B)), in support of the government's application (Paper No. 28, Ex. 1), not only details the agent's own special qualifications but also traces with specificity the history of the government's investigation. Much of the information contained in the affidavit was conveyed to Special Agent Williams by Detective James E. Bradley, Jr., an undercover investigator and a ten year veteran with the District of Columbia Metropolitan Police Department.[4] Special Agent Williams had known Detective Bradley for six years, and found him to be a reliable and truthful law enforcement officer. *See Spinelli v. United States*, 393 U.S. 410, 412–13, 89 S.Ct. 584, 586–87, 21 L.Ed.2d 637 (1965).

In his thirty-three page affidavit, Special Agent Williams advised Judge Howard of a narcotics investigation spanning over four months: from the first meeting between Detective Bradley and a confidential informant on November 26, 1979, to a final heroin transaction between Detective Bradley and Anderson on April 4, 1980. Many of the events reported in the affidavit concerned cocaine and heroin transactions arranged over the target telephones between Detective Bradley and Anderson.[5] The affidavit also reports numerous meetings between Detective Bradley, Anderson, and others, as well as the results of pen register[6] and visual surveillance efforts.

---

297, 302, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972). *See Dalia v. United States*, 441 U.S. 238, 249, 99 S.Ct. 1682, 1689, 60 L.Ed.2d 177 (1979); S.Rep.No.1097, 90th Cong., 2d Sess., *reprinted in* (1968) U.S.Code Cong. & Ad.News 2112, 2154, 2159.

4. Pursuant to a written agreement between the DEA and the District of Columbia Metropolitan Police Department, Detective Bradley was on special assignment to a DEA Drug Task Force. For a complete discussion of the composition of this task force, see section IV *infra*.

5. These telephone calls were recorded with the consent of Detective Bradley. *See, e. g., United*

*States v. White*, 401 U.S. 745, 752, 91 S.Ct. 1122, 1126, 28 L.Ed.2d 453 (1971) (plurality opinion); *Hoffa v. United States*, 385 U.S. 293, 302, 87 S.Ct. 408, 413, 17 L.Ed.2d 374 (1966); *Lopez v. United States*, 373 U.S. 427, 438–39, 83 S.Ct. 1381, 1387–88, 10 L.Ed.2d 462 (1963).

6. Pen register surveillance is not governed by Title III, *United States v. New York Telephone Co.*, 434 U.S. 159, 165–68, 98 S.Ct. 364, 368–70, 54 L.Ed.2d 376 (1977), and is not considered a search within the meaning of the Fourth Amendment. *Smith v. Maryland*, 442 U.S. 735, 739–46, 99 S.Ct. 2577, 2579–2583, 61 L.Ed.2d 220 (1979). For a complete discussion of law

As with traditional search and seizure warrants, *see United States v. Ventresca*, 380 U.S. 102, 108–09, 85 S.Ct. 741, 745–76, 13 L.Ed.2d 684 (1965), applications for interception orders are not to be read in a hypertechnical manner. *See, e. g., United States v. Santarpio*, 560 F.2d 448, 453 (1st Cir.), *cert. denied*, 434 U.S. 984, 98 S.Ct. 609, 54 L.Ed.2d 478 (1977); *United States v. Webster*, 473 F.Supp. 586, 591 (D.Md.1979), aff'd 639 F.2d 174 (4th Cir. 1981). While the reviewing judicial officer must examine the materials presented in terms of (1) the currency and specificity of the information; (2) the reliability of the sources of the information; (3) the nature of the alleged illegal activity; (4) the duration of the activity at the location in question; and (5) the nature of the evidence being sought, *United States v. McGrath*, 622 F.2d 36, 41–42 (2d Cir. 1980), only the probability, and not a *prima facie* showing, of criminal activity is the standard of probable cause. *Brinegar v. United States*, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949). When viewed under the applicable standard, it is readily apparent that the interception application, when read with the affidavit, sets out facts from which Judge Howard could reasonably find that the requirements of 18 U.S.C. § 2518(3) were satisfied.

Defendant Royster's second contention concerning probable cause, that the interception order is invalid because the application did not establish that evidence of criminal activity of Lyons and Royster would be obtained through interceptions, is also without merit. In *United States v. Donovan*, 429 U.S. 413, 428, 97 S.Ct. 658, 668, 50 L.Ed.2d 652 (1977), the Supreme Court held that a "wiretap application must name an individual if the Government has probable cause to believe that the individual is engaged in the criminal activity under investigation and expects to intercept the individual's conversations over the target telephone." *See* 18 U.S.C. § 2518(1)(b)(iv). As far as the record in this case discloses, however, Lyons' and Royster's participation in the narcotics operation was not known to the government prior to the wiretap of Anderson's telephones. The defendants have produced no evidence to the contrary. The court concludes, therefore, that the government was not required to name them, or establish probable cause as to them, in the interception application. *See United States v. Diltz*, 622 F.2d 476, 479–83 (10th Cir. 1980).

## II. Requirement of Necessity

Defendant Royster next contends that there was an insufficient showing that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c). *See* 18 U.S.C. § 2518(1)(c) (requirement of full and complete statement). The purpose of these requirements is to ensure that "wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Kahn*, 415 U.S. 143, 153 n. 12, 94 S.Ct. 977, 983 n. 12, 39 L.Ed.2d 225 (1974). Since "necessity is a keystone of congressional regulation of electronic eavesdropping," *United States v. Williams*, 580 F.2d 578, 587–88 (D.C.Cir.) (footnote omitted), *cert. denied sub nom. Lincoln v. United States*, 439 U.S. 832, 99 S.Ct. 112, 58 L.Ed.2d 127 (1978), courts examine closely challenges for noncompliance and reject applications that misstate or overstate the difficulties involved.[7] *See* C. Fishman, *Wiretapping and Eavesdropping* § 89 (1978). The government's showing of need, however, is "to be tested in a practical and commonsense fashion." S.Rep.No.1097, 90th Cong., 2d Sess., *reprinted in* (1968) U.S.Code Cong. & Ad. News 2112, 2190.

enforcement use of pen registers, see Fishman, Pen Registers and Privacy: Risks, Expectations, and the Nullification of Congressional Intent, 29 *Cath.U.L.Rev.* 557 (1980).

7. "The plain effect of the detailed restrictions of § 2518 is to guarantee that wiretapping or bugging occurs only when there is a genuine need for it and only to the extent that is needed." *Dalia v. United States*, 441 U.S. at 250, 99 S.Ct. at 1689. (footnote omitted).

Special Agent Williams' affidavit sets out the following reasons why the interception order was necessary to further the government's narcotics investigation:

(1) An analysis of telephone toll call records and pen register data failed to establish a conclusive pattern of operation.

(2) Extended stationary surveillance of Anderson's residence was not practicable because the neighborhood is an established one and the residents would notice unfamiliar vehicles on the street.

(3) The government's confidential informant refused to cooperate further out of fear for its safety.

(4) Although Detective Bradley had numerous personal contacts with Anderson, his requests to meet Anderson's supplier were continually refused.

(5) Vehicular surveillance of Anderson had failed to disclose the supplier.

(6) Aerial surveillance was not feasible due to the air traffic restrictions in the Washington, D. C. metropolitan area.

(7) The investigation had failed to identify the major participants in the scheme, the identity of others responsible for narcotics distribution, and the relationships among the known participants.

(8) The investigation had failed to identify the source of the narcotics, the manner of their importation, or the disposition of the proceeds.

(9) The execution of a traditional search and seizure warrant would not generate significant evidence as to those already known to be involved, and would likely alert those who had not yet been identified.

■ In light of these representations it is apparent that Judge Howard had a sufficient basis to find that the interception order was essential to the success of the investigation.[8] *See, e. g., United States v. Clerkley*, 556 F.2d at 714–15; *United States v. Webster*, 473 F.Supp. at 592–95; *United States v. Curreri*, 388 F.Supp. 607, 618–22 (D.Md.1974).

### III. Minimization

Defendant Royster's final contentions are that Judge Howard's order did not contain sufficient minimization guidelines, and that there was insufficient minimization in fact. Both assertions are without merit.[9]

■ First, Judge Howard's order specifically required minimization (Paper No. 28, Ex. 1, p. 3 of the order). *See* C. Fishman, *Wiretapping and Eavesdropping* § 115 (1978). Second, defendant Royster's moving papers consist solely of conclusory allegations of general illegality. Finally, at the motions hearing held on December 19, 1980, neither defendant attempted to introduce any evidence with respect to the reasonableness of the monitoring agents' conduct. *See, e. g., United States v. Scott*, 436 U.S. 128, 135–38, 98 S.Ct. 1717, 1722–23, 56 L.Ed.2d 168 (1978); *United States v. Feldman*, 606 F.2d 673, 677–78 (6th Cir. 1979); *United States v. Clerkley*, 556 F.2d at 716.

### IV. Joint Interception By Members of the DEA Task Force

Lyons' suppression motion is premised upon two parts of Title III.[10] First, 18

---

8. Defendants cannot complain that the interception application did not demonstrate as to them that traditional investigative techniques were or would be ineffective. Prior to the execution of the wiretap of Anderson's telephones their participation in the narcotics scheme was not known to the government. *See, e. g., United States v. Baker*, 589 F.2d 1008, 1011 (9th Cir. 1979).

9. Defendant Royster also contends that the interception order is invalid because it did not contain guidelines concerning the recording of the intercepted conversations. Although Title III does regulate how recordings of intercep-

tions are to be maintained so as to ensure their integrity, 18 U.S.C. § 2518(8)(a), there is no requirement that the interception order itself contain any such guidelines.

10. Lyons also contends that the interceptions constituted a general search in violation of the Fourth Amendment. He relies on *United States v. Sanchez*, 509 F.2d 886 (6th Cir. 1975). Not only is that case wholly distinguishable from the situation presented here, but even a hypertechnical reading of the interception order fails to disclose even the hint of an authorization to conduct a "general, exploratory rummaging."

U.S.C. § 2515 provides that no information derived from wire interceptions "may be received in evidence in any trial, hearing, or other proceeding ... if the disclosure of that information would be in violation of this chapter." Second, 18 U.S.C. § 2518(10)(a) authorizes suppression if:

"(i) the communication was unlawfully intercepted;

(ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or

(iii) the interception was not made in conformity with the order of authorization or approval."

The factual predicate underlying Lyons' motion is that while Judge Howard's order specifically authorized "Special Agents of the Drug Enforcement Administration, United States Department of Justice," to intercept wire communications, the machinery was operated, at least in part, by persons other than DEA Special Agents. The government concedes that the monitoring equipment was operated primarily by District of Columbia Metropolitan Police Officers who were specially assigned to, and members of, a DEA Drug Task Force.

Lyons contends that suppression is mandated for two reasons: (1) Judge Howard's order was violated since persons other than DEA Special Agents intercepted wire communications; and (2) since the order was issued pursuant to 18 U.S.C. § 2516(1), the federal provision, state police officers may not lawfully intercept wire communications under such an order.

Lyons' first contention is based on the plain language of Judge Howard's order. Since non-DEA Special Agents actually intercepted wire communications, Lyons asserts that "the interception was not made in conformity with the order of authorization." 18 U.S.C. § 2518(10)(a)(iii). In response to this argument the government states that it was made clear to Judge Howard, through the application and the accompanying affidavit, that the wiretap would be executed by members of the DEA Task Force, and not solely by DEA Special Agents. (See Williams Affidavit, Paper No. 28, Ex. 1, at p. 2 ¶ 4; p. 4 ¶¶ 5 & 6; p. 29 ¶¶ 42 & 44; and p. 21 ¶ 50). The government maintains that a reviewing court should read the order with the application in a "commonsense and realistic fashion," and that when so read, it is apparent that the issuing Judge understood that DEA Special Agents would be assisted by DEA Task Force members in executing the wiretap.

■■■■ The court agrees that suppression is not warranted on the ground that the interception violated the terms of the authorizing order. 18 U.S.C. § 2518(10)(a)(iii). A plain reading of the interception application and the accompanying affidavit indicates that Judge Howard was apprised of the existence of the DEA Task Force and its role in the investigation. This is not a situation in which the government deliberately ignored special restrictions imposed by the authorizing judge. See, e. g., United States v. Principie, 531 F.2d 1132, 1140–41 (2d Cir. 1976), cert. denied, 430 U.S. 905, 97 S.Ct. 1173, 51 L.Ed.2d 581 (1977). Additionally, Title III requires only that the interception order specify the federal agency authorized to intercept wire communications. 18 U.S.C. § 2518(4)(d). If anything, the order was more specific than Title III requires.[11] Even assuming a technical failure to comply with the terms of the interception order, suppression would be inappropriate.

Writing for the Court in United States v. Donovan, 429 U.S. 413, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977), Justice Powell set forth the following framework for suppression under Title III:

"Resolution of that question must begin with United States v. Giordano, 416 U.S. 505, [94 S.Ct. 1820, 40 L.Ed.2d 341] (1974), and United States v. Chavez, 416 U.S. 562, [94 S.Ct. 1849, 40 L.Ed.2d 380] (1974). Those cases hold that "[not] every failure to comply fully with any re-

---

11. The legislative history is uninstructive as it simply restates the statutory language. S.Rep. No.1097, 90th Cong., 2d Sess., reprinted in [1968] U.S.Code Cong. & Ad.News 2112, 2186.

quirement provided in Title III would render the interception of wire or oral communications 'unlawful.' " *Id.*, at 574–575, [94 S.Ct. at 1855–56]. To the contrary, suppression is required only for a "failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device." *United States v. Giordano, supra,* at 527, [94 S.Ct. at 1832]."

429 U.S. at 433–34. *Accord, United States v. Diana,* 605 F.2d 1307, 1312 (4th Cir. 1979). *See also United States v. Curreri,* 388 F.Supp. at 616–18.

In *Giordano,* the Court required the suppression of interception evidence where the application was not approved by the appropriate Department of Justice official. The Court found that it was Congress' intent to condition the use of interception procedures upon the judgment of specified officials, and that such condition played a central role in the statutory scheme. 416 U.S. at 527–28, 94 S.Ct. at 1832.

In *Chavez,* the application and order did not correctly identify the individual authorizing the application as required by 18 U.S.C. §§ 2518(1)(a) & (4)(d). The Attorney General, however, had in fact given his approval. The Court held that suppression was inappropriate because such misidentification "did not affect the fulfillment of any of the reviewing or approval functions required by Congress." 416 U.S. at 575, 94 S.Ct. at 1856.

*Donovan* concerned 18 U.S.C. § 2518(1)(b)(iv), which requires the government to identify in the application the person whose communications are to be intercepted, and 18 U.S.C. § 2518(8)(d), which requires, in part, the issuing judge to give notice to those persons whose communications were intercepted. Several defendants had received notice but were not named in the application. Two other defendants were inadvertently not listed in the application and did not receive any notice. De-

spite these violations, the Court held that suppression was not warranted. 429 U.S. at 432–39, 97 S.Ct. at 670–73.

Unlike *Giordano,* the instant case does not concern any failure by the government to follow congressionally mandated procedures relating to obtaining judicial approval of an interception order. The problem with the language in the order indicating that the intercepting was to be done by DEA Special Agents is similar to the problem of misidentification in *Chavez.* Here, however, there was no question that the issuing judge knew that the DEA was the authorized federal agency, and that DEA Task Force members would be involved in the interceptions.

 Lyons' second contention is that the government's use of District of Columbia Metropolitan Police officers to assist in monitoring a federally authorized wiretap constitutes an "unlawful interception" under 18 U.S.C. § 2518(10)(a)(i). This assertion is grounded on the fact that Title III has separate provisions for federal and state interception orders. *Compare* 18 U.S.C. § 2516(1) (federal) *with* 18 U.S.C. § 2516(2) (state). Lyons argues that to permit state police officers to intercept communications pursuant to a federally authorized wiretap would (1) ignore Congress' intent in dividing federal/state authorizing responsibility; and (2) permit monitoring by persons not responsible to the official applying for the interception order.

The situation presented here does not appear to have been confronted squarely in any reported decision. An analogous situation was addressed by the Second Circuit in *United States v. Manfredi,* 488 F.2d 588 (2d Cir. 1973), *cert. denied,* 417 U.S. 936, 94 S.Ct. 2651, 41 L.Ed.2d 240 (1974). In that case the court found no violation of 18 U.S.C. § 2518(10)(a)(iii), where federal agents monitored a state authorized wiretap. The court mentioned two factors in reaching its decision. First, the state prosecutor relied on a federal agent's affidavit in applying for the interception order. Second, both Title III, 18 U.S.C. § 2517(1), and the state statute allowed disclosure of

intercepted communications to law enforcement officials.[12] As to this second point the court commented:

"If such information may be exchanged after the termination of surveillance, we perceive no reason why that information may not be disclosed to cooperating agencies contemporaneously with its interception."

488 F.2d at 601. *Compare United States v. Marion*, 535 F.2d 697, 707 (2d Cir. 1976) (where federal and state officials pursue a joint investigation, the better practice is for the federal officials to secure a separate interception order relating to the federal offenses believed involved.)

Similarly, in *United States v. Webster*, 473 F.Supp. at 599–600, Judge Young of this Court held that evidence obtained through a state authorized wiretap should not be suppressed in a federal prosecution where there had been a joint state-federal investigation. Judge Young's reasoning tracks substantially that outlined in *Manfredi*.

While the reasoning in *Manfredi* and *Webster* is not without appeal, it does not answer fully the questions raised by Lyons' second contention. Title III's disclosure provision, 18 U.S.C. § 2517, relates to an "after-the-fact" event. Moreover, disclosure of information obtained through wiretapping is proper only when the actual interceptions were themselves authorized. *See* S.Rep.No.1097, 90th Cong., 2d Sess., *reprinted in* [1968] U.S.Code Cong. & Ad. News 2112, 2188. The issue here, however, is whether the method of interception used by the government was "authorized" by Title III.

In enacting Title III Congress was greatly concerned with "the widespread use and abuse of electronic surveillance techniques." [13] S.Rep.No.1097, 90th Cong., 2d Sess., *reprinted in* [1968] U.S.Code Cong. & Ad.News 2112, 2154. *See United States v. United States District Court*, 407 U.S. at 302, 92 S.Ct. at 2129. The principal purpose of section 2516 is to ensure that electronic surveillance is carried out in a responsible fashion. Section 2516(1), the federal provision, "centralizes in a publicly responsible official subject to the political process the formulation of law enforcement policy on the use of electronic surveillance techniques ... Should abuses occur, the lines of responsibility lead to an identifiable person." S.Rep.No.1097, 90th Cong., 2d Sess., *reprinted in* [1968] U.S.Code Cong. & Ad.News 2112, 2185. The same policy considerations underly section 2516(2), the state provision. S.Rep.No.1097, 90th Cong., 2d Sess., *reprinted in* [1968] U.S.Code Cong. & Ad.News 2122, 2187.

In this case wiretapping was conducted pursuant to a federally authorized interception order. The factual issue then is whether those persons actually monitoring the telephone calls were subject to the direction of, and were responsible to, an appropriate federal official or agency. To answer this question the court must examine the nature and function of the DEA Task Force.

At the hearing on December 19, 1980, the court heard testimony from Lt. William J. Merritt and DEA Special Agent W. Alfred Williams. The government also introduced a copy of the Agreement between the DEA and the District of Columbia Metropolitan Police Department, which established the Task Force and was in effect during the wiretapping at issue in this case.

Lt. Merritt is a District of Columbia Metropolitan Police Officer. He has been detailed to the DEA Task Force since October,

---

**12.** 18 U.S.C. § 2517(1) allows disclosure of the intercepted communications to any "investigative or law enforcement officer," as defined in 18 U.S.C. § 2510(7). *See* S.Rep.No.1097, 90th Cong., 2d Sess., *reprinted in* [1968] U.S.Code Cong. & Ad.News 2112, 2188.

**13.** The debate over the propriety of electronic eavesdropping has generated a large volume of scholarly commentary. *See, e. g.*, E. Lapidus, *Eavesdropping on Trial*, (1974); H. Schwartz, *Taps, Bugs and Fooling the People* (1977); A. Westin, *Privacy and Freedom* (1967); Note, Electronic Intelligence Gathering and the Omnibus Crime Control and Safe Streets Act of 1968, 44 *Fordham L.Rev.* 331 (1975); Note, Electronic Surveillance, Title III, and Requirement of Necessity, 2 *Hastings Const.L.Q.* 571 (1975).

1978, and is the Task Force's group commander. Lt. Merritt is under the direct supervision of David G. Canaday, Special Agent-In-Charge of the DEA's Washington, D. C., field office. Lt. Merritt maintains his office at the DEA field office.

According to Lt. Merritt, the DEA Task Force is comprised of both DEA Special Agents and officers of the District of Columbia Metropolitan Police. DEA Special Agents are chosen by Special Agent-In-Charge Canaday, and the Metropolitan Police officers are selected by the District of Columbia Chief of Police. All reports made during the course of a Task Force investigation are filed with the DEA, and all Task Force members have been instructed in DEA policy and procedure.[14] Special Agent-In-Charge Canaday must approve all Task Force investigations and has "final say" over all phases of an investigation. Although Lt. Merritt is responsible for the day-to-day operation of the Task Force, he consults with Special Agent-In-Charge Canaday on a daily basis.

The Agreement establishing the Task Force (Government's Motion Ex. 1) states that the "DEA is to have direct management over the manner, direction and method or details of performance of the Task Force." (Agreement at ¶ 2). The Agreement also provides as follows:

> "it is expressly understood that the law enforcement officers assigned to the Task Force by the MPD will be under Federal supervision and will be deemed an employee of the United States for the purpose of the Federal Tort Claims Act and any other Federal Tort liability statute."

(Agreement at ¶ 2).

Finally, the Agreement indicates that police officers "assigned to the Joint DEA

Task Force pursuant to this Agreement are detailed pursuant to the Intergovernmental Personnel Act, 5 U.S.C. 3371-3376." (Agreement at ¶ 10). As such, Metropolitan Police officers who are members of the Task Force are subject to numerous standards governing the conduct of federal employees. 5 U.S.C. § 3374(c)(2).

DEA Special Agent Williams is the team leader of the Task Force group that conducted the narcotics investigation, including the electronic surveillance. Further, as the case agent, he is directly responsible for the activities of the team members. Special Agent Williams testified that it was his responsibility to ensure that the wiretap was conducted in accordance with DEA procedures, and that he instructed Task Force members as to the proper handling of the equipment and the tapes.

Special Agent Williams further testified that three team members were assigned to monitor the listening post on each shift, and that at least one of the members so assigned was a DEA Special Agent. Special Agent Williams stated that he could not recall an instance where one DEA Special Agent was not replaced by another when a shift changed.

In an effort to demonstrate who was actually at the listening post at any given time, the government has submitted a copy of the "sign in" log that was kept at the listening post, along with an affidavit of Special Agent Williams explaining the notations thereon (Paper No. 30). The "sign in" log purportedly indicates that there was a DEA Special Agent on duty at the listening post for fifty-four of the sixty shifts during the twenty day period of the wiretap.[15] Although the "sign in" log does not appear to be entirely accurate,[16] it does suggest

---

**14.** A majority of the Task Force members attended a two-week DEA training program prior to their assignment to the Task Force. The balance received instruction as to DEA policy and procedure after they had been assigned.

**15.** Although Special Agent John H. King was scheduled to be present at the listening post for six midnight shifts in April 1980, his name does not appear on the sign in log. Special Agent King's work records, however, indicate that he

did work during that month, and Special Agent Williams stated that he could not recall any instance where Special Agent King was not on duty as scheduled (Williams Affidavit, Paper No. 30).

**16.** Defendant Lyons correctly points out that the sign in log is not a perfect indicator of whether someone was actually present at the listening post. For example, transcripts of wire interceptions for April 20 and April 25,

that there was a DEA Special Agent present at, or at least available to, the Task Force members at the listening post during the time that the wiretap was in place and operating.

In light of the foregoing, the court finds that the officers of the District of Columbia Metropolitan Police, detailed to the Task Force, were legally under the supervision of the DEA, and that they were actually supervised by that agency during the period of time that wire communications were intercepted pursuant to a federally authorized interception order. Congress' intent to maintain lines of responsibility, therefore, was not frustrated by the DEA's use of Task Force members to monitor the wiretap.[17]

Accordingly, it is this 26th day of January, 1981 by the United States District Court for the District of Maryland, *ORDERED*:

1. Defendants' motions to suppress wiretap evidence are DENIED.

2. The Clerk is instructed to forward a copy of this Memorandum and Order to counsel for the parties.

1980, indicate that the wiretap was monitored by persons not listed on the sign in log.

**17.** In any event, the court concludes that suppression would not be warranted under the standard set out in *United States v. Donovan*, 429 U.S. at 433–34, 97 S.Ct. at 671.